**Rolando RUIZ, TDCJ No. 999145, Petitioner,**

**v.**

**Rick THALER, Director, Texas Department of Criminal Justice, Correctional Institutions Division, Respondent.**

**Civil No. SA–03–CA–303–OG.**

United States District Court, W.D. Texas, San Antonio Division.

April 6, 2011.

Chris K. Gober, Chris K. Gober, Attorney at Law, P.C., San Antonio, TX, Kathryn M. Kase, Texas Defender Service, Houston, TX, for Petitioner.

Jeremy C. Greenwell, Leslie K. Kuykendall, Office of the Attorney General, Austin, TX, for Respondent.

## POST–REMAND MEMORANDUM OPINION AND ORDER DENYING RELIEF

ORLANDO L. GARCIA, District Judge.

This Court denied petitioner's federal habeas corpus petition collaterally attacking his 1995 Bexar County capital murder conviction and sentence of death. *Ruiz v. Dretke,* 2005 WL 2146119 (W.D.Tex. August 29, 2005), *affirmed,* 460 F.3d 638 (5th Cir.2006), *cert. denied,* 549 U.S. 1283, 127 S.Ct. 1815, 167 L.Ed.2d 326 (2007). On the eve of his execution, petitioner filed a motion for relief from judgment pursuant to Rule 60(b), Fed.R.Civ.P., which this Court denied on both substantive and procedural grounds. *Ruiz v. Quarterman,* 2007 WL 2437401 (W.D.Tex. July 10, 2007). The Fifth Circuit immediately stayed petitioner's execution. In October, 2007, the Fifth Circuit reversed and remanded this cause to this Court with directions that this Court consider "on the merits" petitioner's assertions of ineffective assistance by petitioner's trial counsel during the punishment phase of petitioner's trial. *Ruiz v. Quarterman,* 504 F.3d 523, 532 (5th Cir.2007). For the reasons set forth hereinafter, this Court finds petitioner is entitled to neither federal habeas relief nor a Certificate of Appealability from this Court.

### I. Defining the Claims Before this Court on Remand

In his amended petition, filed January 20, 2009, docket entry no. 70, petitioner argued his trial counsel rendered ineffective assistance by (1) failing during the punishment phase of petitioner's capital murder trial to present mitigating evidence readily available through Dr. Henry Munsinger (the state-court-appointed mental health expert who had examined petitioner) and (2) failing to conduct an adequate investigation into petitioner's background for additional mitigating evi-

dence (which petitioner claimed would have produced additional mitigating evidence establishing the very difficult circumstances of petitioner's childhood, as well as petitioner's long history of substance abuse). In subsequent pleadings, as well as during the evidentiary hearing held November 2–3, 2010, petitioner also argued his trial counsel should have retained the services of a mental health professional who could have opined regarding the impact of petitioner's alleged cocaine addiction on petitioner's conduct at the time of petitioner's offense.

After more than three years of extensive investigation by petitioner's federal habeas counsel, the expenditure of thousands of dollars of investigative and expert expenses, this Court held an evidentiary hearing in this cause on November 2–3, 2010.[1]

## II. *The Constitutional Standard Governing Ineffective Assistance Claims*

■ The constitutional standard for reviewing petitioner's complaints about the performance of his trial counsel is well-settled. The Sixth Amendment entitles criminal defendants to "the effective assistance of counsel," *i.e.*, legal representation that does not (1) fall below an objective standard of reasonableness in light of prevailing professional norms and the circumstances of the defendant's case (*Wong v. Belmontes*, —— U.S. ——, ——, 130 S.Ct. 383, 384, 175 L.Ed.2d 328 (2009); *Bobby v. Van Hook*, —— U.S. ——, ——, 130 S.Ct. 13, 16, 175 L.Ed.2d 255 (2009)); and (2) give rise to a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different (*Porter v. McCollum*, —— U.S. ——, ——, 130 S.Ct. 447, 452–53, 175

L.Ed.2d 398 (2009); *Wong v. Belmontes*, —— U.S. at ——, 130 S.Ct. at 386).

The constitutional standard for determining whether a criminal defendant has been denied the effective assistance of *trial* counsel, as guaranteed by the Sixth Amendment, was announced by the Supreme Court in *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984):

A convicted defendant's claim that counsel's assistance was so defective as to require reversal of a conviction or death sentence has two components. First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.

■ To satisfy the first prong of *Strickland*, i.e., establish that his counsel's performance was constitutionally deficient, a convicted defendant must show that counsel's representation "fell below an objective standard of reasonableness." *Wiggins v. Smith*, 539 U.S. 510, 521, 123 S.Ct. 2527, 2535, 156 L.Ed.2d 471 (2003); *Williams v. Taylor*, 529 U.S. 362, 390–91, 120 S.Ct. 1495, 1511, 146 L.Ed.2d 389 (2000). In so doing, a convicted defendant must carry the burden of proof and overcome a strong presumption that the conduct of his trial counsel falls within a wide range of reasonable professional assistance. *Strickland v. Washington*, 466 U.S.

---

**1.** A detailed summary of the largely hearsay testimony presented during the evidentiary hearing held in this cause on November 2–3, 2010, appears in this Court's Order Striking Hearsay testimony, issued November 22, 2010, docket entry no. 141.

at 687–91, 104 S.Ct. at 2064–66. Courts are extremely deferential in scrutinizing the performance of counsel and make every effort to eliminate the distorting effects of hindsight. *See Wiggins v. Smith,* 539 U.S. at 523, 123 S.Ct. at 2536 (holding the proper analysis under the first prong of *Strickland* is an objective review of the reasonableness of counsel's performance under prevailing professional norms which includes a context-dependent consideration of the challenged conduct as seen from the perspective of said counsel at the time). "No particular set of detailed rules for counsel's conduct can satisfactorily take account of the variety of circumstances faced by defense counsel or the range of legitimate decisions regarding how best to represent a criminal defendant." *Bobby v. Van Hook,* —— U.S. at ——, 130 S.Ct. at 16; *Strickland v. Washington,* 466 U.S. at 688–89, 104 S.Ct. at 2065. It is strongly presumed counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. *Strickland v. Washington,* 466 U.S. at 690, 104 S.Ct. at 2066.

To satisfy the "prejudice" prong, a convicted defendant must establish a reasonable probability that, but for the objectively unreasonable misconduct of his counsel, the result of the proceeding would have been different. *Wiggins v. Smith,* 539 U.S. at 534, 123 S.Ct. at 2542; *Strickland v. Washington,* 466 U.S. at 694, 104 S.Ct. at 2068. A reasonable probability is a probability sufficient to undermine confidence in the outcome of the proceeding. *Id.*

■ In evaluating prejudice in the context of the punishment phase of a capital trial, a federal habeas court must reweigh all the evidence in aggravation against the totality of available mitigating evidence (had the petitioner's trial counsel chosen a different course). *Wong v. Bel-*

*montes,* —— U.S. at ——, 130 S.Ct. at 386; *Wiggins v. Smith,* 539 U.S. at 534, 123 S.Ct. at 2542. *Strickland* does not require the State to "rule out" or negate a sentence of life in prison to prevail; rather, it places the burden on the defendant to show a "reasonable probability" that the result of the punishment phase of a capital murder trial would have been different. *Wong v. Belmontes,* —— U.S. at ——, 130 S.Ct. at 390–91.

■ In those instances in which the state courts failed to adjudicate either prong of the *Strickland* test, this Court's review of the un-adjudicated prong is *de novo. See Porter v. McCollum,* —— U.S. at ——, 130 S.Ct. at 452 (holding *de novo* review of the allegedly deficient performance of petitioner's trial counsel was necessary because the state courts had failed to address this prong of *Strickland* analysis); *Rompilla v. Beard,* 545 U.S. 374, 390, 125 S.Ct. 2456, 2467, 162 L.Ed.2d 360 (2005)(holding *de novo review* of the prejudice prong of *Strickland* was required where the state courts rested their rejection of an ineffective assistance claim on the deficient performance prong and never addressed the issue of prejudice); *Wiggins v. Smith,* 539 U.S. at 534, 123 S.Ct. at 2542 (holding the same).

■ A habeas petitioner has the burden to prove both prongs of the *Strickland* ineffective assistance standard by a preponderance of the evidence. *Rogers v. Quarterman,* 555 F.3d 483, 489 (5th Cir. 2009), *cert. denied,* —— U.S. ——, 130 S.Ct. 365, 175 L.Ed.2d 62 (2009); *Blanton v. Quarterman,* 543 F.3d 230, 235 (5th Cir.2008), *cert. denied,* —— U.S. ——, 129 S.Ct. 2383, 173 L.Ed.2d 1301 (2009); *Montoya v. Johnson,* 226 F.3d 399, 408 (5th Cir.2000), *cert. denied,* 532 U.S. 1067, 121 S.Ct. 2220, 150 L.Ed.2d 212 (2001).

■ Under the well-settled *Strickland* standard, the Supreme Court recognizes a strong presumption that counsel rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment. *Bell v. Cone,* 535 U.S. 685, 698, 122 S.Ct. 1843, 1852, 152 L.Ed.2d 914 (2002); *Strickland v. Washington,* 466 U.S. at 690, 104 S.Ct. at 2066; *Scheanette v. Quarterman,* 482 F.3d 815, 820 (5th Cir.2007); *Sonnier v. Quarterman,* 476 F.3d 349, 356 (5th Cir.2007), *cert. denied,* 552 U.S. 948, 128 S.Ct. 374, 169 L.Ed.2d 259 (2007); *Amador v. Quarterman,* 458 F.3d 397, 410 (5th Cir.2006), *cert. denied,* 550 U.S. 920, 127 S.Ct. 2129, 167 L.Ed.2d 866 (2007); *Gonzales v. Quarterman,* 458 F.3d 384, 390 (5th Cir.2006), *cert. denied,* 549 U.S. 1323, 127 S.Ct. 1909, 167 L.Ed.2d 568 (2007).

### III. *The Applicable Standard of Review*

■ The parties disagree as to whether the highly deferential standard of review applicable under the AEDPA applies to petitioner's claims herein. Under the AEDPA standard of review, this Court cannot grant petitioner federal habeas corpus relief in connection with any claim that was adjudicated on the merits in state court proceedings, unless the adjudication of that claim either: (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States, or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the state court proceeding. *Brown v. Payton,* 544 U.S. 133, 141, 125 S.Ct. 1432, 1438, 161 L.Ed.2d 334 (2005); *Williams v. Taylor,* 529 U.S. 362, 404–05, 120 S.Ct. 1495, 1519, 146 L.Ed.2d 389 (2000); 28 U.S.C. § 2254(d).

■ This Court concludes the AEDPA has no application to petitioner's claims herein because, notwithstanding the Fifth Circuit's analysis of the procedural history of this cause in its remand order, there has never been any state court ruling "on the merits" of petitioner's ineffective assistance claims herein. In those instances in which the state courts failed to adjudicate either prong of the *Strickland* test, such as this one, this Court's review of the unadjudicated prong is necessarily *de novo. See Porter v. McCollum,* ____ U.S. at ____, 130 S.Ct. at 452 (holding *de novo* review of the allegedly deficient performance of petitioner's trial counsel was necessary because the state courts had failed to address this prong of *Strickland* analysis); *Rompilla v. Beard,* 545 U.S. 374, 390, 125 S.Ct. 2456, 2467, 162 L.Ed.2d 360 (2005)(holding *de novo* review of the prejudice prong of *Strickland* was required where the state courts rested their rejection of an ineffective assistance claim on the deficient performance prong and never addressed the issue of prejudice); *Wiggins v. Smith,* 539 U.S. at 534, 123 S.Ct. at 2542 (holding the same). In this case, no state court has ever addressed the merits of either prong of *Strickland* analysis vis-a-vis any of petitioner's ineffective assistance claims herein.

To understand this conclusion, it is necessary to review the highly atypical procedural history of this cause.[2] Petitioner

---

**2.** Thanks in significant part to the Fifth Circuit's remand Order in this cause, federal habeas corpus petitioners in this Court have begun routinely asserting unexhausted claims as a matter of course, demanding stays and the abatement of their federal habeas corpus proceedings, often for years on end, so they can return to state court and pursue state habeas remedies which regard to their unexhausted claims. Because these stays are often demanded prior to either party furnishing this court with copies of the relevant state

filed his federal habeas corpus petition in this Court in February, 2004, asserting therein a number of. claims, including a pair of ineffective assistance claims which both parties acknowledged at that time to be unexhausted. *Docket entry no. 18.* Specifically, petitioner argued his trial counsel had rendered ineffective assistance by failing to (1) adequately investigate petitioner's background for potentially mitigating evidence and (2) present Dr. Harry Munsinger's report and opinions to the jury at the punishment phase of petitioner's capital murder trial. When respondent urged summary rejection of petitioner's unexhausted ineffective assistance claims as procedurally defaulted (*see docket entry no. 22*), petitioner argued the incompetence of petitioner's state habeas counsel, in failing to recognize, identify, and assert petitioner's unexhausted ineffective assistance claims constituted "cause and actual prejudice" sufficient to overcome petitioner's procedural default on his unexhausted claims (*see docket entry no. 25*). Relying upon well-settled Fifth Circuit precedent, this Court concluded the obvious deficiencies in the performance of petitioner's state habeas counsel did not excuse petitioner's failure to exhaust available state remedies on his unexhausted claims and were insufficient to overcome petitioner's procedural default on same.

*See Ruiz v. Dretke,* 2005 WL 2146119, *12–*14 (holding the "inexplicable failure" of petitioner's state habeas counsel to raise any of petitioner's ineffective assistance claims therein in the course of petitioner's first state habeas corpus proceeding did not rise to the level of "cause" under the "cause and actual prejudice" exception to the procedural default doctrine).

*Significantly, as of the date this Court ruled initially on petitioner's unexhausted claims, petitioner had never asked this Court to stay this cause to permit petitioner to return to state court to exhaust state habeas remedies on his then-unexhausted ineffective assistance claims.* Only thereafter, in a series of post-judgment motions, did petitioner request a stay to permit petitioner to return to state court and raise for the first time his then-unexhausted ineffective assistance claims. Relying upon well-settled Fifth Circuit precedent, this Court rejected those requests, concluding petitioner was unlikely to ever obtain state habeas review *on the merits* on his unexhausted ineffective assistance claims. *See Ruiz v. Dretke,* 2005 WL 2402503 (W.D.Tex. September 13, 2005)(denying motion to amend); *Ruiz v. Dretke,* 2005 WL 2402669 (W.D.Tex. September 15, 2005)(denying motion for stay); *Ruiz v. Dretke,* 2005 WL 2620193 (W.D.Tex. October 13, 2005)(denying in

court records, and in light of the Fifth Circuit's remand Order in this cause, this Court has been forced to grant virtually all such requests for stay and abatement. The Fifth Circuit's recent opinions in *Balentine v. Thaler,* 626 F.3d 842 (5th Cir.2010), and *Rocha v. Thaler,* 626 F.3d 815 (5th Cir.2010), appear to back away from the expansive reading of Rule 60(b) made by the Fifth Circuit in Ruiz's case, there is a practical problem facing every District Court confronted with request for a stay to permit a return to state court to pursue state habeas remedies on an unexhausted claim. That is, simply put, the inability of a District Court to foresee whether, at some point in the distant future, the Texas Court of

Criminal Appeals will a boilerplate Order of summary dismissal for noncompliance with state writ-abuse principles which the Fifth Circuit might find to be "ambiguous," as was the case with the petitioner herein. Until there is concrete guidance from the Fifth Circuit regarding precisely when a federal District Court may dismiss as procedurally defaulted an unexhausted federal habeas claim without fear the same claim will be resurrected years later through the expedient of a Rule 60(b) motion, the prudent course will remain to grant all such requests for stay and abatement. Sadly, such guidance is not found in either of the recent *Balentine* or *Rocha* opinions.

part and granting in part motion for CoA); *Ruiz v. Dretke,* 2005 WL 3271652 (W.D.Tex. November 17, 2005)(denying motion for reconsideration).

In an opinion issued in August, 2006, the Fifth Circuit affirmed this Court's dismissal on procedural default grounds of petitioner's then-unexhausted ineffective assistance claims and implicitly rejected petitioner's arguments that this Court should have stayed this cause to permit petitioner to return to state court and file a second state habeas application. *Ruiz v. Quarterman,* 460 F.3d 638, 644 (5th Cir. 2006)("the law of this Court is clear; ineffective state habeas counsel does not excuse failure to raise claims in state habeas proceedings."). In March, 2007, the United States Supreme Court denied petitioner's petition for writ of certiorari. *Ruiz v. Quarterman,* 549 U.S. 1283, 127 S.Ct. 1815, 167 L.Ed.2d 326 (2007).

Despite having been aware of his unexhausted ineffective assistance claims since not later than February, 2004, petitioner waited until July, 2007 to return to the state courts and seek to present his ineffective assistance claims. On July 6, 2007, the Texas Court of Criminal Appeals summarily dismissed petitioner's second state habeas corpus application, citing the applicable state writ-abuse statute. When peti-

tioner thereafter waited until the day before his scheduled July 10, 2007 execution to file a Rule 60(b) motion and a motion for stay of execution, this Court denied both motions as untimely and lacking in merit. *Ruiz v. Quarterman,* 2007 WL 2437401 (W.D.Tex. July 10, 2007). The Fifth Circuit immediately issued a stay of execution. In an opinion issued October 11, 2007, the Fifth Circuit concluded this Court erred in construing the Texas Court of Criminal Appeals' summary order of dismissal as a summary order of dismissal and held said summary order of dismissal was "ambiguous" with regard to whether the Texas Court of Criminal Appeals had reached the merits of petitioner's underlying ineffective assistance claims. *Ruiz v. Quarterman,* 504 F.3d 523, 527 (5th Cir.2007)(holding "the decisional basis here is uncertain" despite its conclusion only one of the seven members of the Texas Court of Criminal Appeals participating in the case had attempted to address the merits of petitioner's underlying Sixth Amendment claims).

Under even the most generous construction of the procedural history in this case, no Texas state court has ever issued a ruling definitively addressing the merits of petitioner's ineffective assistance claims herein.[3] In fact, insofar as petitioner argues his trial counsel should have retained

---

**3.** Notwithstanding its vague allusions to the Supreme Court's holding in *Michigan v. Long,* 463 U.S. 1032, 103 S.Ct. 3469, 77 L.Ed.2d 1201 (1983), the Fifth Circuit's remand order did not explain how the single concurring opinion issued by one of the seven Texas Court of Criminal Appeals judges who participated in petitioner's second state habeas corpus proceeding somehow transformed that state appellate court's summary dismissal based on state writ-abuse principles into a decision "on the merits" of petitioner's underlying ineffective assistance claims. The Michigan Supreme Court opinion the United States Supreme Court reviewed in *Michigan v. Long* addressed the merits of a *Terry* search of an automobile trunk and seizure of mari-

juana; the Michigan Supreme Court ruled the particular search violated both the Michigan state constitution and the Fourth Amendment of the United States Constitution. *Michigan v. Long,* 463 U.S. at 1037 n. 3, 103 S.Ct. at 3474 n. 3. In contrast, the Texas Court of Criminal Appeals' summary dismissal order issued July 6, 2007 was identical to literally hundreds of similar summary dismissal orders on writ-abuse grounds issued by that state appellate courts for more than two decades, all of which had been accepted by federal courts throughout Texas, as well as the Fifth Circuit, as "independent and adequate" grounds for procedural default in federal habeas corpus proceedings. *See Aguilar v. Dret-*

the services of a mental health expert other than Dr. Munsinger, petitioner has not yet "fairly presented" that claim to any state court even as of this date.[4] Thus, there is no existing state court judgment, much less any discernable state court findings of fact or conclusions of law, to which this Court could give deference under the AEDPA even if it were inclined to do so.

Because no state court has ever addressed the merits of any of petitioner's ineffective assistance claims herein, the AEDPA is inapplicable to petitioner's claims and this Court must resort to *de novo* review of same. *Porter v. McCollum*, —— U.S. at ——, 130 S.Ct. at 452 (holding *de novo* review of the allegedly deficient performance of petitioner's trial

*ke,* 428 F.3d 526, 533 (5th Cir.2005)(holding the Texas abuse of the writ rule ordinarily is an adequate and independent procedural ground on which to base a procedural default ruling), *cert. denied,* 547 U.S. 1136, 126 S.Ct. 2059, 164 L.Ed.2d 793 (2006); *Matchett v. Dretke,* 380 F.3d 844, 848 (5th Cir.2004)(holding the violation of the Texas writ-abuse rule ordinarily furnishes an adequate and independent procedural ground which bars federal habeas review of a claim), *cert. denied,* 543 U.S. 1124, 125 S.Ct. 1067, 160 L.Ed.2d 1074 (2005); *Bagwell v. Dretke,* 372 F.3d 748, 755–56 (5th Cir.2004)(holding a petitioner procedurally defaulted by failing to "fairly present" a claim to the state courts in his state habeas corpus application), *cert. denied,* 543 U.S. 989, 125 S.Ct. 498, 160 L.Ed.2d 374 (2004); *Cotton v. Cockrell,* 343 F.3d 746, 755 (5th Cir.2003)(holding the Texas writ abuse doctrine is an adequate and independent barrier to federal habeas review of unexhausted claims), *cert. denied,* 540 U.S. 1186, 124 S.Ct. 1417, 158 L.Ed.2d 92 (2004); *Henderson v. Cockrell,* 333 F.3d 592, 605 (5th Cir.2003) (recognizing the Texas writ-abuse doctrine has been strictly and regularly applied since before August, 1997), *cert. denied,* 540 U.S. 1163, 124 S.Ct. 1170, 157 L.Ed.2d 1208 (2004); *Smith v. Cockrell,* 311 F.3d 661, 684 (5th Cir.2002)(holding unexhausted claims were procedurally barred), *cert. dism'd,* 541 U.S. 913, 124 S.Ct. 1652, 158 L.Ed.2d 263 (2004); *Jones v. Johnson,* 171 F.3d 270, 276–77 (5th Cir.1999)(holding unexhausted ineffective assistance claim procedurally barred from federal habeas review), *cert. denied,* 527 U.S. 1059, 120 S.Ct. 29, 144 L.Ed.2d 832 (1999); *Muniz v. Johnson,* 132 F.3d 214, 221 (5th Cir.1998)(holding unexhausted claims procedurally barred), *cert. denied,* 523 U.S. 1113, 118 S.Ct. 1793, 140 L.Ed.2d 933 (1998); *Nobles v. Johnson,* 127 F.3d 409, 423 (5th Cir.1997)(holding the Texas writ-abuse rule an adequate and independent barrier to federal habeas review of unexhausted claims),

*cert. denied,* 523 U.S. 1139, 118 S.Ct. 1845, 140 L.Ed.2d 1094 (1998).

Curiously, the Fifth Circuit has recently engaged in some rather creative analysis of *Michigan v. Long* in an effort to avoid applying the rule it announced in its remand order herein to other Rule 60(b) motions filed by federal habeas petitioners confronted by summary dismissal of subsequent state writ applications under circumstances virtually identical to Ruiz's. See *Balentine v. Thaler,* 626 F.3d 842, 849–57 (5th Cir.2010)(upholding denial of a Rule 60(b) motion presented to the District Court in circumstances almost identical to Ruiz's herein); *Rocha v. Thaler,* 626 F.3d 815, 821–41 (5th Cir.2010)(distinguishing summary writ-abuse dismissals by the Texas Court of Criminal Appeals under § 5(a)(1) of Article 11.071 of the Texas Code of Criminal Procedure from summary dismissals under § 5(a)(3) of the same statute despite the fact the Texas Court of Criminal Appeals rarely ever distinguishes between which subsection of Article 11.071 it relies upon when dismissing on state writ-abuse principles).

4. A copy of petitioner's subsequent state habeas corpus application is attached to Petitioner's Motion for relief from Judgment Pursuant to Rule 60(b), Fed.R.Civ.P., filed 9, 2007, docket entry no. 40. At no point in petitioner's subsequent state writ application did petitioner specifically complain about his trial counsel's failure to secure the services of an additional mental health expert to testify regarding the deleterious effects of petitioner's alleged cocaine addiction. Pursuant to 28 U.S.C. § 2254(b)(1), this Court cannot grant relief on that claim unless petitioner can establish there is an absence of available state corrective process or circumstances exist which render such process ineffective to protect petitioner's rights.

counsel was necessary because the state courts had failed to address this prong of *Strickland* analysis).

## IV. *Evaluating the Credibility of Petitioner's Claims of Rampant Childhood Abuse and Cocaine Addiction*

### A. *Evidence of Child Abuse*

During his capital murder trial, petitioner took the stand and testified he came from a "good" family and said he chose to live with his grandmother and aunt when he was growing up.[5] Petitioner did admit, however, that (1) when he drank alcohol or used drugs, he was disrespectful to his

family and (2) he had once "almost" fought with his step-father when they both came home drunk.[6] Petitioner also admitted his mother had thrown him out of the house at least ten times (for not getting a job and not getting his life straight) and he did not get along with his step-father but he was nonetheless welcome to spend the night at his mother's house.[7]

During the evidentiary hearing held in this cause November 2–3, 2010, petitioner's federal habeas counsel attempted to portray petitioner's mother as a mentally unbalanced prostitute who repeatedly abandoned petitioner.[8] The problem with

---

**5.** S.F. Trial, Volume 33, testimony of Rolando Ruiz, at pp. 341, 345.

**6.** *Id.*, at pp. 468–71.

**7.** *Id.*, at pp. 406–07, 473–74.

**8.** Petitioner's former step-father, Mike Cisneros, testified (1) he was married to petitioner's mother from 1979 until 1984, (2) he was never contacted by petitioner's trial counsel or trial defense team, (3) he had no knowledge of any physical abuse of petitioner by himself, petitioner's mother, or any other person during the course of his marriage to petitioner's mother, (4) he last saw petitioner in 1983, (5) petitioner's mother admitted to Cisneros that, prior to their marriage, she had prostituted herself, (6) on one occasion, petitioner's mother took Cisneros' handgun and allegedly used it to threaten her abusive father, (7) Cisneros and petitioner's mother argued frequently during their marriage, sometimes physically, (8) while petitioner was in the house during those arguments, petitioner was never in the same room as them during the arguments, (9) Cisneros divorced petitioner's mother because she spent more money than he earned, and (10) Cisneros had no knowledge that petitioner was ever aware of either petitioner's mother working as a prostitute or the incident in which petitioner's mother allegedly threatened her father with Cisneros' weapon. Federal Evidentiary Hearing Transcript (henceforth "FEH Transcript"), Volume 1, docket entry no. 150, testimony of Miguel "Mike" Cisneros, Jr., at pp. 126–27, 130–31, 138–44. Cisneros did not testify he had witnessed any physical abuse of

petitioner by any person or petitioner abusing drugs.

Petitioner's aunt, Rosa Ruiz, testified (1) she was never contacted by petitioner's trial counsel or any member of petitioner's defense team, (2) Paul Rangel is currently married to petitioner's mother, (3) petitioner's mother was the product of a rape and this fact was openly discussed with her family, (4) her father had two other families and was not around much when she and her sisters were growing up, (5) she and her sister Velia were both molested by an uncle when they were young, (6) Velia also claimed their father sexually assaulted her, (7) at one time she suspected the petitioner was abusing drugs but she never knew that for a fact and has never seen petitioner abuse drugs, (8) she was unaware petitioner's mother had mental problems but did know petitioner's mother twice attempted suicide, (9) petitioner's first attempted suicide when petitioner was four or five by slicing her wrists, (10) the petitioner was inside the apartment when his mother made this first suicide attempt but did not understand what had happened, (11) petitioner's mother was hospitalized only a single day after that first suicide attempt, (12) petitioner's mother made a second suicide attempt when petitioner was 14 or 15 years old by swallowing pills, (13) petitioner was present for this second suicide attempt but she never discussed petitioner's mother's second suicide attempt with petitioner, (14) neither petitioner nor his mother received any psychological counseling following either of petitioner's mother's suicide attempts, (15) during the

this effort was that, other than Yolanda Mendoza's testimony that she found petitioner sleeping outside his Aunt's apartment on two occasions when she was coming home late at night from herself working as a prostitute, there was virtually no testimony of any physical abuse of

petitioner except rank hearsay testimony in which petitioner's relatives merely repeated what petitioner had told them as a child, i.e., that he had been beaten by his step-father, forced by his mother's boyfriend to face the wall or stay in the bathroom, or there was no food at his home.[9]

first five years of his life, petitioner lived with his maternal grandmother off and on, (16) she did see Mike Cisneros grab petitioner tight on occasion but never saw Cisneros paddle petitioner, (17) she considered Cisneros' treatment of petitioner to be mistreatment, (18) petitioner told her Paul Rangel had hit petitioner but she never saw any bruises or injuries on petitioner, (19) she never personally witnessed Paul Rangel strike petitioner, (20) at one point, petitioner's mother placed petitioner in a shelter because she was stressed out, (21) petitioner briefly lived with his biological father when petitioner was about 16 years old, (22) while attending school, petitioner lived at many different addresses with his mother, maternal grandmother, or paternal grandmother, (23) she was never aware that petitioner was a member of a gang, and (24) petitioner's mother told Rosa that she had sent petitioner out to purchase marijuana for petitioner's mother to smoke. FEH Transcript, Volume 1, testimony of Rosa Ruiz, at pp. 161–65, 168–78, 180–81, 184–87, 189–91.

**9.** *See testimony of Griselda Gutierrez, summarized in note 10, infra.*

Yolanda Garcia Mendoza testified (1) she was a former neighbor of petitioner's Aunt Rosa Ruiz, (2) she was a former prostitute and drug addict who frequently returned home around three or four a.m., (3) two or three times when petitioner was eight or nine years old, she found petitioner sleeping outside on the porch to Rosa Ruiz's apartment when she returned home in the early morning hours, (4) when she woke petitioner on those occasions, the petitioner would tell her something had happened at home and he was waiting for his Aunt Rosa and her family to wake up, (5) Alazan Apache Courts were not a safe place for a child at that hour, (6) she never saw the petitioner with his mother, and (7) she never saw anyone abuse the petitioner or the petitioner abuse drugs. FEH Transcript, Volume 1, testimony of Yolanda Garcia Mendoza, at pp. 149, 151–55, 159.

Petitioner's former uncle Ramon Ruiz testified (1) he was married to petitioner's Aunt

Velia from 1981 through 1987 and knew petitioner from about age 9 through age 16–17, (2) he was never contacted by petitioner's trial counsel or any member of petitioner's trial defense team, (3) during petitioner's mid-teen years, he knew petitioner often would appear in the middle of the night at the homes of relatives, including petitioner's maternal grandmother, petitioner's Aunt Rosa, and at Ramon and Velia Ruiz's home and seek permission to spend the night because either his mother and step-father were fighting or petitioner had been kicked out of the house, (4) on at least two occasions, petitioner's mother went with petitioner to a relative's home because she had been fighting with her husband, Paul Rangel, (5) petitioner's maternal grandfather was physically and sexually abusive toward the women in his family, but (6) Ramon Ruiz never saw petitioner's maternal grandfather abuse petitioner. FEH Transcript, Volume 1, testimony of Ramon Ruiz, at pp. 221–27, 230–33, 236. Significantly, Ramon Ruiz did not testify he had witnessed any physical abuse of petitioner or that he had ever witnessed petitioner abusing drugs.

Petitioner's uncle David Ruiz testified (1) he met petitioner in 1981 when petitioner was about nine years old, (2) he was married to petitioner's Aunt Rosa, (3) petitioner lived with him and Rosa and their family for about a year when petitioner was nine or ten years old because petitioner's mother left petitioner with them, (4) petitioner was very respectful and well-behaved when he lived with him and Rosa and their family, (5) years later, after petitioner dropped out of high school petitioner often spent the weekend with them and their family, (6) he had no knowledge that petitioner ever abused drugs, (7) he testified briefly at petitioner's trial, (7) petitioner's trial counsel first contacted him on the day he testified at petitioner's trial, (8) petitioner's female trial counsel never asked him any questions about petitioner's background, and (9) petitioner's female trial counsel asked him no questions about petitioner's disadvantaged

There was testimony about a single incident in which a relative observed petitioner at an early age to have lice in his hair.[10] There was also testimony that, on one occasion when petitioner was young, petitioner was beaten by his mother.[11]

background when he testified at petitioner's trial. FEH Transcript, Volume 1, testimony of David Ruiz, at pp. 197–202, 204–08, 212–20. David Ruiz offered no testimony showing he ever witnessed any physical abuse of petitioner by any person.

10. Petitioner's aunt Griselda Gutierrez testified (1) she was petitioner's aunt on his father's side, (2) she was never contacted by petitioner's trial counsel or any member of petitioner's defense team, (3) she lived with petitioner's biological parents after they were first married, (4) she has no knowledge of any physical abuse or alcoholism in the home when she lived with them, (5) petitioner was in the hospital for an extended period with kidney problems when he was about six months old, (6) she never saw any fighting in petitioner's home, (7) petitioner's mother did like to sleep late, (8) on one occasion, petitioner's mother argued with petitioner's biological father, threw coins at her husband, then called a taxi and left with petitioner, (9) eventually, petitioner's mother divorced petitioner's biological father, (10) Ms. Gutierrez moved to California in 1975, on one occasion in 1976, when petitioner was about four years old, she visited petitioner's mother at a house on Grayson and Broadway to take petitioner back to Mexico for a visit and, during that trip, petitioner related that there was no food in the refrigerator, (11) she and others observed lice in petitioner's hair during their trip to Mexico, (12) also during their trip to Mexico, petitioner told Ms. Gutierrez he had been directed to face the wall or to go to the bathroom by one or more of his mother's boyfriends, (13) petitioner was always very thin as a child, (14) Ms. Gutierrez's mother wanted to adopt petitioner but petitioner's mother would not allow same, (15) after she moved to California, Ms. Gutierrez only infrequently saw petitioner until 1979, when petitioner was about six, (16) thereafter, Ms. Gutierrez had only infrequent contact with petitioner, (17) she was unaware of any teen drug use or alcohol abuse by petitioner, (18) she visited petitioner in the Bexar County Adult Detention Center (henceforth "BCADC") while petitioner was awaiting trial for capital murder, (19) petitioner told her one of the Rodriguez brothers was a friend of his who pressured petitioner

to commit the murder, (20) petitioner told her he had used multiple drugs for many days the week before he committed the crime to enable petitioner to commit the crime, (21) petitioner told her he got the money to purchase the drugs from the victim's husband, and (22) petitioner told her he was not conscious at the time he committed the murder. FEH Transcript, Volume 1, testimony of Griselda Gutierrez, at pp. 104, 106, 110–11, 113–19, 121, 123.

11. Petitioner's cousin Mark Molina testified (1) he saw petitioner almost daily when they were growing up, (2) petitioner often spent the night with Molina's family and petitioner even lived with Molina's family for a time (Molina identified his parents are David and Rosa Ruiz), (3) his mother (Rosa Ruiz) would physically whip Molina with whatever she could get her hands on when he was a child but only verbally disciplined petitioner, (4) on one occasion when they were young, petitioner's mother slapped and pulled petitioner's hair because Molina had left a sheet or blanket on the hallway floor, (5) petitioner and Molina began abusing alcohol when they were 15 or 16 years old, (6) later, petitioner began drinking with other friends outside the Ruiz home, (7) petitioner was actively involved with a break-dancing group around age 16, (8) Molina often heard and saw petitioner's mother arguing with Paul Rangel and Molina often witnessed petitioner's mother with bruises and swelling to her arms and face, (9) Rangel and petitioner's mother pressured petitioner to go out and get a job to bring money into their family, (10) Rangel and petitioner's mother kicked petitioner out of their apartment on several occasions because petitioner would not get a job, (11) petitioner did not get along very well with Rangel, (12) petitioner lived about half a mile from Molina's residence, (13) Molina moved into an apartment leased by petitioner after Molina's mother (Rosa Ruiz) kicked Molina out of her home for being "bad," (14) petitioner joined a street gang called the "Bad Boys" at age seventeen because petitioner believed they were his only friends, (15) Molina and petitioner smoked weed on an almost daily basis, whenever they could get some,

This testimony was not, however, accompanied by any objective evidence showing petitioner sustained any injuries as a result of the latter incident, much less that any such injuries required medical attention. Likewise, petitioner presented this Court with no credible evidence establishing petitioner ever sustained any identifiable injury as a result of any beating or other abuse his relatives allegedly inflicted upon him or witnessed. Instead, the bulk of the abuse/neglect testimony presented to this Court through petitioner's friends and family consisted almost exclusively of hearsay testimony given by witnesses in which they simply relating statements made by petitioner to them. There was testimony which showed the petitioner spent a lot of time with his other relatives (who lived a short distance from the home in which petitioner lived with his mother and step-father Paul Rangel) but petitioner presented no credible evidence to this Court showing that his presence at his relatives' homes on those occasions was anything other than voluntary on his part.[12] For instance, petitioner's cousin Mark Molina testified pe-

---

(16) petitioner also used acid, but (17) Molina does not believe petitioner was addicted to drugs when they were living together. FEH Transcript, Volume 2, testimony of Mark Molina, at pp. 279–84, 286–93, 295–97.

**12.** *See notes 8–11, supra.*
Petitioner's younger cousin Laura Rodriguez Chapa testified (1) while she was called to testify at the punishment phase of petitioner's capital murder trial, she was not contacted by petitioner's trial counsel until the day before she actually testified, (2) petitioner's male attorney spoke with her for a total of about 15 minutes and told her he wanted her to say something positive about petitioner, (3) said counsel did not ask her about petitioner's family, background, or life history, (4) her grandmother adopted her when she was even years old but, thereafter, she frequently visited the home of her biological mother, Rosa Ruiz, (5) she frequently encountered petitioner at her biological mother's home, (6) petitioner often stayed in her biological mother's home, (7) she never knew why petitioner stayed there, (8) other than yelling at petitioner, she never saw petitioner's mother discipline petitioner, (9) she never saw any baby pictures of petitioner in his mother's home, (10) when petitioner moved into his own apartment at age 18, petitioner's mother did not help petitioner to do so, and (11) she has never been in trouble with the law. FEH Transcript, Volume 2, testimony of Laura Rodriguez Chapa, at pp. 247–53, 256, 258–60.
Another of petitioner's younger cousins testified (1) she was 16 at the time of petitioner's capital murder trial, (2) no one associated with petitioner's trial defense team ever contacted her, (3) she was five years old when she first met petitioner, (4) her father is David Ruiz, (5) she visited her father's home frequently before she moved in with her father at age 11 when she was in the sixth grade, (6) she saw petitioner frequently after she moved in with her father and step-mother Rosa Ruiz, (7) David Ruiz and Rose Ruiz both always treated petitioner very well, (8) neither Daid nor Rosa ever spanked petitioner, (9) she saw petitioner with his mother, (10) she also frequently visited Rosa's parents Dore and Jino, who always treated her well, (11) she never saw Jino drink, (12) she never knew any of petitioner's friends to be gang members, (12) she thought petitioner's friends were nice and motivated young men who were into basketball and break-dancing, (13) petitioner treated her like a sister and danced with her at her quinceanera, (14) she was not aware petitioner was involved with drugs, and (15) she was unaware of any abuse inflicted on petitioner. FEH Transcript, Volume 2, testimony of Angela Ruiz a/k/a Danella Guerrero, at pp. 263–69.
Another of petitioner's younger female cousins testified (1) she was born in 1978, (2) she used to see petitioner two or three times a week, (3) at one point, petitioner stayed at her home, (4) in 1985 when she broke her leg and was placed in a long cast, petitioner would carry her upstairs, (5) there was a close relationship between petitioner's mother and the daughter of Paul Rangel, Lisa Rangel, (6) Lisa suffered from a serious heart condition, (7) once petitioner's mother began caring for Lisa, she began paying more attention to Lisa than petitioner, and (8) she never saw petitioner abused by anyone. FEH Transcript, Volume 2, testimony of Wendy Ruiz, at pp. 270, 272–75, 277.

titioner was kicked out of petitioner's home by petitioner's mother and step-father because petitioner would not get a job.[13] However, Molina did not specify how old petitioner was at the time of these incidents; nor did Molina claim to have witnessed these events himself. Moreover, Molina's testimony merely corroborated petitioner's trial testimony.[14]

There was likewise a dearth of testimony during the evidentiary hearing from persons having *personal knowledge* of the conditions inside the home in which petitioner apparently spent most of his formative years.[15] Petitioner did not testify during the evidentiary hearing in this cause. Petitioner did not call his mother (Maria "Monica/Aurelia" Rangel) to testify about conditions in their family's home. Likewise, petitioner also failed to call his second step-father (Paul Rangel) to testify despite petitioner's federal habeas counsel's accusations that Rangel had physically abused petitioner. The witnesses whom petitioner did present during the evidentiary hearing denied possessing any personal knowledge concerning the allegedly abusive conditions inside the household where the petitioner spent his formative years.[16]

During his capital murder trial, petitioner took the stand and denied that he had ever been abused physically or mentally as

---

**13.** *FEH Transcript*, Volume 2, testimony of Mark Molina, at p. 289.

**14.** Petitioner testified during the guilt-innocence phase of his trial that his mother had kicked him out of her apartment more than ten times for failing to get a job. S.F. Trial, Volume 33, testimony of Rolando Ruiz, Jr., at pp. 406–07. Petitioner did not specify precisely when these events occurred.

**15.** For instance, petitioner's uncle Daid Ruiz, petitioner's former uncle Ramon Ruiz, and petitioner's female cousins Laura Rodriguez Chapa, Angela Ruiz a/k/a Danella Guerrero, and Wendy Ruiz all testified during the evidentiary hearing held November 2–3, 2010 that they had extensive contact with petitioner but none offered any eyewitness testimony to any physical abuse of petitioner or petitioner's abuse of drugs. FEH Transcript, Volume 1, testimony of David Ruiz, at pp. 197–220; testimony of Ramon Ruiz, at pp. 221–36; Volume 2, testimony of Laura Rodriguez Chapa, at pp. 247–60; testimony of Angela Ruiz a/k/a Danella Guerrero, at pp. 260–69; testimony of Wendy Ruiz, at pp. 270–77.

Petitioner's aunt Rosa Ruiz testified before this Court that (1) she never saw Paul Rangel strike petitioner, (2) she never saw bruises or injuries on petitioner when he lived with Rangel, (3) she had seen Mike Cisneros grab petitioner in a manner she considered to be too tight, (4) the only information she had about any alleged physical abuse of petitioner by Rangel came from petitioner himself, (5) she had no idea petitioner was drinking or using drugs when he was growing up, and (6) she had no knowledge petitioner was in a gang. FEH Transcript, Volume 1, testimony of Rosa Ruiz, at pp. 161–91. Significantly, Rosa also testified petitioner was too young to understand what was happening at the time of petitioner's mother's first suicide attempt and she never discussed petitioner's mother's second suicide attempt with petitioner. *Id.*, at pp. 173–75.

While petitioner's paternal aunt Griselda Gutierrez did testify before this Court about several instances of alleged abuse of petitioner, all the factual information on which she based her testimony about those incidents came exclusively from the petitioner, who was four or five years old at the time he related those incidents to her, and she denied any personal knowledge of actual physical abuse of petitioner. FEH Transcript, Volume 1, testimony of Griselda Gutierrez, at pp. 113–17, 123. She also testified she had no personal knowledge of any drug or alcohol abuse by petitioner during his teen years. *Id.*, at pp. 117, 123. Moreover, she recounted statements petitioner made during his pretrial detention which would have proven very helpful to the prosecution at trial and which undermine the mitigating value of any expert opinions asserting petitioner was addicted to cocaine at the time of his offense. *Id.*, at pp. 118–21.

**16.** *See note 15 supra.*

a child.[17] Despite that fact, during the evidentiary hearing in this cause, petitioner's federal habeas counsel attempted to portray petitioner's step-fathers, i.e., Mike Cisneros and Paul Rangel, and petitioner's own mother, Maria Rangel, as physically abusive toward petitioner. The problem with these efforts was that the only eyewitness testimony to any alleged physical abuse directed toward petitioner by these three persons came from (1) petitioner's aunt Rosa Ruiz, who testified she once witnessed Mike Cisneros grab petitioner too tightly,[18] and (2) petitioner's cousin Mark Molina, who described a single instance, when he and the petitioner were young, in which petitioner's aunt Rosa Ruiz and petitioner's mother Monica beat the petitioner because Molina had left a blanket lying on the floor.[19] There was absolutely no evidence presented to this Court establishing the precise nature of any injuries petitioner allegedly sustained in either of those alleged incidents. There is no credible evidence before this Court showing petitioner ever required or received medical treatment for any injuries sustained in any beating or other alleged abuse allegedly inflicted upon petitioner by his mother or any of his step-fathers.

Petitioner's mental health expert, Dr. Seth Silverman testified before this Court that, based upon his interviews with petitioner and petitioner's family members, he believed (1) the petitioner grew up in a "horribly abusive" family situation in which petitioner was regularly beaten by his alcoholic step-fathers, (2) petitioner began abusing drugs at age 13–14, (3) petitioner began displaying atypically aggressive behaviors shortly before his capital offense which Dr. Silverman attributed to petitioner's cocaine addiction, (4) petitioner's post-arrest violent conduct could be attributed to petitioner's de-toxing from cocaine weeks and even months after arrest, (5) petitioner was abusing alcohol, marijuana, LSD, and cocaine at the time of his offense, (6) petitioner was involved in Hispanic gangs with a culture of drug abuse, (7) the only things petitioner could count on from his family were being abused, abandoned, beaten, and starved by them, (8) jail or prison life would be a stabilizing influence in petitioner's life, and (9) petitioner's tendencies toward drug abuse and gang membership were prompted by petitioner's "horribly abusive childhood," which included many missed opportunities for intervention and drug treatment.[20]

It is apparent the family members with whom Dr. Silverman spoke (including Rosa Ruiz and Mark Molina) told him something quite different from what they testified before the Court in this case. Dr. Silverman relied on Rosa Ruiz as the primary source to corroborate petitioner's claims he was starved, routinely beaten, and otherwise abused by his step-fathers and mother.[21] Yet, as explained above, Rosa Ruiz denied any personal knowledge of such abuse when she testified before this Court.[22] Numerous family members, in-

---

17. S.F. Trial, Volume 33, testimony of Rolando Ruiz, at p. 345.

18. FEH Transcript, Volume 1, testimony of Rosa Ruiz, at p. 178. She also admitted she never saw Paul Rangel strike the petitioner and never saw any bruises or other injuries on petitioner. *Id.*, at pp. 180–81.

19. FEH Transcript, Volume 2, testimony of Mark Molina, at p. 295.

20. FEH Transcript, Volume 2, testimony of Dr. Seth Silverman, at pp. 364, 367–71, 375–85, 387–90.

21. FEH Transcript, Volume 2, testimony of Dr. Seth Silverman, at pp. 376, 387–89.

22. *See notes 8, 15, 18, supra, and accompanying text.*

cluding Rosa Ruiz, testified before this Court they never witnessed petitioner being subjected to any physical abuse during his childhood.[23] Mark Molina was the only witness appearing before this Court who claimed to have ever personally witnessed any physical abuse directed toward petitioner and his testimony identified only a single instance of alleged physical abuse.[24]

This Court finds there is no credible evidence establishing petitioner suffered from a childhood of abuse as severe and horrific as that described by Dr. Silverman in his testimony before this Court. Undoubtedly, petitioner experienced a very disruptive childhood, stayed numerous places with many different relatives, and lacked stability in his family relationships. It appears equally clear petitioner's family was financially stressed throughout his childhood. However, this Court finds no credible evidence supports a finding that petitioner experienced the type of severe and extreme abuse upon which Dr. Silverman based his opinions and conclusions herein. On the contrary, the only source of information for either Dr. Silverman or petitioner's relatives who did testify before this Court suggesting petitioner was ever severely abused or beaten as a child appears to be petitioner himself. When given the opportunity to furnish sworn testimony regarding his childhood, however, petitioner categorically denied he had been abused as a child.[25] Petitioner chose not to testify before this Court. Petitioner's family offered this Court no eyewitness testimony to any alleged abuse of petitioner as a child. Petitioner chose not to call any witnesses who had personal knowledge

of alleged abuse inside the Rangel home. Under such circumstances, this Court finds incredible the factual basis underlying Dr. Silverman's conclusions that petitioner suffered a "horribly abusive childhood."

### B. *Cocaine Addiction*

Dr. Silverman relied upon Mark Molina to corroborate petitioner's claims that he (petitioner) abused cocaine prior to fatally shooting Theresa Rodriguez[26]; but Molina gave no testimony before this Court suggesting he ever had any personal knowledge of petitioner's alleged *cocaine* use and Dr. Silverman admitted even Molina was unable to confirm petitioner's claims to have consumed massive quantities of cocaine immediately prior to murdering Theresa Rodriguez.[27] Thus, there appear to be serious credibility issues with the factual information upon which Dr. Silverman based his opinions and conclusions. In fact, contrary to the assumptions underlying Dr. Silverman's conclusions and opinions, this Court finds no credible evidence exists in the record now before this Court establishing the petitioner ever used cocaine prior to the days immediately before his execution-style slaying of Theresa Rodriguez. Mark Molina never mentioned *cocaine* when he testified before this Court regarding petitioner's alleged drug use. No other member of petitioner's family who testified before this Court mentioned any alleged cocaine abuse by petitioner. Petitioner claimed in his testimony at the guilt-innocence phase of his trial that he began abusing alcohol, mari-

---

**23.** *See notes 8–12, 15, 18, supra, and accompanying* text.

**24.** *See note 11, supra.*

**25.** S.F. Trial, Volume 33, testimony of Rolando Ruiz, Jr., at p. 345.

**26.** FEH Transcript, Volume 2, testimony of Dr. Seth Silverman, at pp. 376, 382–83.

**27.** *Id.,* at p. 383.

juana, LSD, and eventually cocaine.[28] But petitioner offered neither his trial jury nor this Court any testimony establishing precisely when he first claimed to have begun abusing cocaine. Neither Rosa Ruiz nor Mark Molina nor any other eyewitness presented this Court with any testimony suggesting petitioner ever ingested *cocaine* prior to the date the Rodriguez brothers paid petitioner the one-thousand-dollar down-payment on petitioner's execution of Theresa Rodriguez. There is absolutely no credible evidence now before this Court establishing petitioner began abusing cocaine prior to the days immediately before his murder of Theresa Rodriguez. There is no evidence before this Court suggesting petitioner, who worked various menial jobs at a hotel and newspaper, ever possessed sufficient financial resources to purchase cocaine on a regular basis prior to petitioner agreeing to participate in the Rodriguez brothers' murder-for-hire scheme. Thus, this Court finds Dr. Silverman's conclusions regarding petitioner's long-term cocaine use and cocaine addiction to be without sufficient evidentiary basis in the record.

It should be noted that there was a significant practical problem facing petitioner's trial counsel had they called Mark Molina to testify on this subject at trial. Molina testified before this Court at the evidentiary hearing that petitioner was actively involved in a gang when they were growing up.[29] This testimony was contrary to petitioner's trial testimony, in which petitioner vigorously denied being involved with gangs.[30]

At the guilt-innocence phase of petitioner's trial, petitioner took the stand and repeatedly asserted he was high on cocaine and pot at the time of his offense.[31] In fact, petitioner claimed he was so heavily intoxicated on the night of the offense that he could not recall committing the offense.[32] Nonetheless, petitioner repeatedly admitted that he had shot Theresa Rodriguez.[33] Petitioner admitted to fatally shooting Theresa Rodriguez but persistently denied he knew the Rodriguez brothers or that he had killed Theresa Rodriguez for money.[34]

Griselda Gutierrez, petitioner's aunt, testified before this Court she visited petitioner in jail prior to his trial and the petitioner related to her (1) petitioner was friends with one of the Rodriguez brothers, (2) petitioner obtained money from the husband of his victim to get drugs, and (3) under pressure from the Rodriguez brothers to commit the murder, petitioner took large quantities of multiple drugs in the days immediately prior to the murder "to get the courage" to commit the offense.[35]

Dr. Harry Munsinger examined petitioner on behalf of petitioner's trial counsel but, other than being advised by petitioner that petitioner was intoxicated at the time of his offense due to ingestion of an un-

---

28. S.F. Trial, Volume 22, testimony of Rolando Ruiz, Jr., at pp. 344–45.

29. FEH Transcript, Volume 2, testimony of Mark Molina, at p. 293.

30. S.F. Trial, Volume 33, testimony of Rolando Ruiz, at pp. 408, 417, 419.

31. S.F. Trial, Volume 33, testimony of Rolando Ruiz, at pp. 344–45, 360–61, 384–85, 427, 429, 459–63, 465–66, 474–76.

32. *Id.*, at pp. 358–59, 361, 366, 380–81, 427, 429, 439–40, 459, 474–76.

33. *Id.*, at pp. 357–58, 364, 383–84, 399, 428, 477, 482–83, 486.

34. *Id.*, at pp. 350–51, 353–54, 365, 371, 383–84, 399, 400–01, 427, 440, 442, 477, 485–86, 488, 490.

35. FEH Transcript, Volume 1, testimony of Griselda Gutierrez, at pp. 118–21.

specified substance, Dr. Munsinger never discussed the facts of petitioner's crime with the petitioner.[36] Likewise, Dr. Munsinger made no effort to obtain information concerning the circumstances of petitioner's offense from any third-party.[37] Thus, all the statements in Dr. Munsinger's report suggesting the petitioner was suffering the effects of intoxication at the *time of the offense* appear to mimic statements made to Dr. Munsinger by petitioner. Likewise, Dr. Munsinger's conclusions in his report that the petitioner tends to retreat into fantasy when confronted with stress were not explored by either party except insofar as Dr. Munsinger testified the petitioner reported a history of "blackouts," i.e., amnesiac episodes of less than a day, which petitioner attributed to his own heavy drinking.[38] In sum. Dr. Munsinger's conclusions in his report were based solely on information related to him by the petitioner and petitioner's psychological test results.[39] Dr. Munsinger did conclude, based upon petitioner's clinical interview and psychological test scores, that petitioner was suffering from diminished capacity at the time of his offense attributable to petitioner's ingestion of unknown substances.[40] Significantly, the factual information upon which Dr. Munsinger relied in reaching his conclusions appears to have come exclusively from the petitioner and to be greatly at odds with the petitioner's own sworn testimony at his trial, during which petitioner categorically denied any history of childhood abuse. Moreover, Dr. Munsinger admitted petitioner may very well have omitted significant information from his clinical interview, including any mention of petitioner's mother's suicide attempts.[41]

Other than petitioner's own trial testimony, virtually all of the factual evidence now before this Court regarding petitioner's drug abuse at the time *of his offense* comes from the petitioner himself and was related to this Court through Dr. Henry Munsinger's testimony and the largely hearsay testimony of Dr. Seth Silverman. Dr. Silverman testified, in part, that the petitioner related to him that the petitioner had a long history of multiple substance abuse and had ingested cocaine prior to committing the offense.[42] This aspect of Dr. Silverman's hearsay testimony merely repeats the same self-serving allegations petitioner made during his own trial testimony, which petitioner's jury implicitly rejected. Dr. Silverman opined that petitioner's "atypical" violent behavior immediately before and immediately after the offense (while in custody) was the product of petitioner's cocaine intoxication and the process of petitioner "detoxing" from cocaine abuse.[43] Significantly, Dr. Silverman did not address the substantial trial evidence establishing petitioner's violent behavior during pretrial detention in the months following petitioner's arrest was gang-related.

36. FEH Transcript, Volume 2, testimony of Harry Munsinger, at pp. 314, 325, 327–28, 332, 345, 347–49.

37. *Id.*, at pp. 313, 321, 330, 348–49.

38. *Id.*, at pp. 343–45.

39. *Id.*, at pp. 302, 309–16, 318, 322–23, 333, 341–45, 347–49.

40. *Id.*, at pp. 313–14, 322–23, 325, 328, 332, 347–49, 355–58.

41. *Id.*, at pp. 341–43.

42. FEH Transcript, Volume 2, testimony of Dr. Seth Silverman, at pp. 375–79, 381–83. Dr. Silverman testified Rosa Ruiz and Mark Molina corroborated petitioner's statements suggesting petitioner had a long history of multi-substance abuse. *Id.*, at pp. 375–76, 382–83.

43. *Id.*, at pp. 377–83.

Mark Molina testified he and the petitioner abused alcohol (with Rosa Ruiz's approval) starting in their early-teens to mid-teens.[44] Molina also testified he and the petitioner used marijuana almost daily when they lived together at an apartment off San Pedro.[45] Molina claimed petitioner had used LSD but admitted he had never seen the petitioner do so.[46] It was likewise unclear from Molina's testimony before this Court whether he claimed to have any personal knowledge of petitioner's alleged cocaine abuse. Molina specifically denied that the petitioner was addicted to any drugs when they were residing together.[47] Undaunted, petitioner's federal habeas counsel elicited hearsay testimony from Dr. Silverman to the effect that *Molina* told Dr. Silverman the petitioner was using *cocaine* heavily in the *weeks* prior to the offense.[48] For the reasons set forth above, this Court finds Molina's hearsay testimony in this regard wholly incredible.[49] There is no credible evidence now before this Court establishing petitioner ever used cocaine prior to the *days* immediately leading up to petitioner's execution of Theresa Rodriguez, i.e., after Mike Rodriguez made the down-payment for petitioner's murder of Theresa Rodriguez.

With regard to petitioner's claims that he had a long history of drug abuse, this Court is confronted with testimony from Molina and hearsay testimony from petitioner's mental health experts which is largely cumulative of the testimony petitioner himself gave at trial. Other than suggesting petitioner was addicted to cocaine, neither Dr. Munsinger nor Dr. Silverman offered any significant testimony before this Court regarding petitioner's history of substance abuse beyond that contained in petitioner's own trial testimony. This Court has disregarded a vast amount of rank hearsay testimony offered by petitioner's federal habeas counsel during the evidentiary hearing herein because, under the retrospective lens of *Strickland* analysis, petitioner's trial counsel cannot reasonably be faulted for failing to discover, develop, and present *inadmissible* hearsay testimony. Petitioner's family members, other than Molina, categorically denied any personal knowledge regarding petitioner's alleged drug abuse when they testified before this Court. Insofar as those same family members furnished affidavits or gave Dr. Silverman interviews in which they furnished very different information concerning their knowledge of petitioner's alleged drug abuse than the facts to which they testified under oath during the evidentiary hearing in this Court, this Court considers Dr. Silverman's conclusions to be unsupported and entitled to

44. FEH Transcript, Volume 2, testimony of Mark Molina, at pp. 286–87.

45. *Id.*, at p. 292.

46. *Id.*, at p. 292.

47. *Id.*, at pp. 296–97.

48. FEH Transcript, Volume 2, testimony of Dr. Seth Silverman, at pp. 382–83.

49. Petitioner neither testified before this Court nor presented any other witness who could testify from personal knowledge regarding petitioner's drug use immediately prior to petitioner's fatal shooting of Theresa Rodriguez. Thus, this Court chooses to rely upon petitioner's trial testimony on this subject which establishes only that petitioner began using cocaine shortly before petitioner actually shot Theresa Rodriguez. The testimony of petitioner's aunt Griselda Gutierrez before this Court implicitly supports this conclusion because she testified without contradiction that the petitioner told her he obtained money to purchase drugs from the husband of his victim and then began consuming many drugs for the express purpose of getting the courage to commit his capital offense. FEH Transcript, Volume 1, testimony of Griselda Gutierrez, at pp. 118–21.

very little evidentiary weight. It was unreasonable for Dr. Silverman to have relied upon the affidavits of petitioner's family members in forming his conclusions herein when those same family members repudiated their own affidavits during their testimony before this Court.

Petitioner failed to carry his burden of proof at the evidentiary hearing in this cause to show the existence of *admissible* additional mitigating evidence which might have impacted the outcome of the punishment phase of petitioner's capital murder trial. As is explained at length hereinafter, there is simply no credible evidence before this Court establishing the existence at the time of petitioner's trial of additional *admissible* mitigating evidence sufficient to raise doubts as to the validity of the outcome of the punishment phase of petitioner's capital murder trial.

### V. *Analyzing Petitioner's Strickland Claims*

#### A. *The Context*

##### 1. *Overview*

The facts and circumstances surrounding petitioner's offense are set forth in detail in this Court's original Memorandum Opinion and Order denying federal habeas relief issued August 29, 2005. *Ruiz v. Dretke*, 2005 WL 2146119, *1–*2 (W.D.Tex. August 29, 2005), *affirmed*, 460 F.3d 638 (5th Cir.2006), *cert. denied*, 549 U.S. 1283, 127 S.Ct. 1815, 167 L.Ed.2d 326 (2007). To summarize, shortly after his arrest for Theresa Rodriguez's fatal shooting, on three separate dates, petitioner gave three written statements to police in which he described (1) negotiating with Theresa's husband Michael and her brother-in-law Mark to murder Theresa in exchange for the sum of two thousand dollars and (2) fatally shooting Theresa in the presence of Michael and Mark inside the garage of Theresa and Michael's residence on the evening of July 14, 1992. *Id.*

At trial, however, petitioner took the stand and repeatedly denied he had ever executed any of his written statements, denied he knew either Theresa Rodriguez's husband or brother-in-law, denied he murdered Theresa for remuneration, and instead, claimed his fatal shooting of Theresa was a random act of violence he had committed while in a drug-induced stupor.[50]

##### 2. *Guilt–Innocence Phase of Trial*

The prosecution presented overwhelming evidence at both phases of petitioner's capital murder trial. At the guilt-innocence phase, the prosecution presented three written statements executed by petitioner, all implicating petitioner in Theresa Rodriguez's fatal shooting and explaining petitioner fatally shot Theresa in exchange for what ultimately amounted to approximately thirteen hundred dollars. More specifically, the evidence showed that, on the same date he was arrested, i.e., July 23, 1992,[51] petitioner gave police a written statement in which he asserted that (1) shortly after petitioner left jail on an unrelated charge, Mark Rodriguez approached petitioner and offered to pay petitioner to kill his brother's wife, (2) petitioner then got into a car with Mark and Mark's brother Mike, who drove them to Macaro-

---

**50.** S.F. Trial, Volume 33, testimony of Rolando Ruiz, at pp. 340–490.

**51.** A San Antonio Police Officer testified that he arrested petitioner at approximately 2:30 a.m. on July 23, 1992. Statement of Facts from petitioner's trial (henceforth "S.F. Tri-al"), Volume 31, testimony of Clay Gill, at p. 80. The same officer testified that he personally witnessed petitioner being read his *Miranda* rights at approximately 3:14 a.m. after they arrived at the police station at approximately 2:53 a.m. *Id.*, at p. 81.

ni's restaurant in Northwest San Antonio, showed petitioner the location where the Rodriguez brothers and the victim would park the following evening, and instructed petitioner to kill the victim as soon as the trio arrived at the restaurant, (3) the Rodriguez brothers then drove petitioner back to the location where they had picked him up and instructed petitioner to call them the next morning to ensure the plan was still on, (4) along the way, the Rodriguez brothers promised to pay petitioner two thousand dollars, one thousand up front and one thousand after, to kill Michael's wife, (5) the following morning, petitioner telephoned one of the Rodriguez brothers, who directed petitioner to commit the offense as they had outlined it the evening before, (6) that evening, when the petitioner arrived at the restaurant, he saw a security guard and left the scene, (7) petitioner telephoned one of the Rodriguez brothers and informed them that he would not kill Michael's wife at the restaurant because there were too many people and a security guard there, (8) the following date, petitioner again spoke with one of the Rodriguez brothers, who informed petitioner the murder would take place outside a movie theater in North San Antonio the following Monday evening, (9) petitioner went to the movie theater at the designated time on Monday but never saw the Rodriguez brothers' vehicle and left, (10) when petitioner telephoned Mark that night, he was informed that something had come up and that he should call back later, (11) when petitioner did so, Mark informed petitioner the murder would take place at the same movie theater on Thursday, (12) when petitioner telephoned Mark at 7:00 p.m. on Thursday to verify that the plan was still on, Mark informed petitioner that the trio were at the movie theater, (13) Mark directed petitioner to park by the side of the theater and, if petitioner did not feel he could execute the murder there, to follow the Rodriguez brothers and the victim home, (14) petitioner went to the theater Thursday night, saw the Rodriguez brothers and Theresa come out of the theater, and followed them home, (15) petitioner saw them pull into their driveway, (16) petitioner drove to the next house over, parked, and walked to the Rodriguez's driveway, where he pretended to ask directions from Mark, (17) Mike got out of the car, opened the trunk, and handed Mark a gym bag, (18) petitioner asked Mark "Do I do it?" and Mark replied "Yes," (19) Mike got back in the car, pulled it into the garage, and parked it, (20) petitioner walked up to the passenger side of the car, pointed the gun at head of "the lady" as she stepped out of the car, and shot her once, (21) petitioner fled the scene without taking her purse, (22) Mark paid petitioner the first thousand dollars on the Friday before the murder, (23) the day after the murder, Mark informed petitioner that he could not get to his brother because there were a lot of people around him, (24) the following Thursday, Mark promised to pay petitioner the other thousand but failed to do so, but (25) the next day, a Friday, Mark did finally deliver the second thousand dollars to petitioner.[52]

**52.** Petitioner's written statement given July 23, 1992 was admitted into evidence during petitioner's trial as State Exhibit no. 17 and read to the jury. S.F. Trial, Volume 31, testimony of Vidal Resendez, at pp. 136–41. The San Antonio Police detective to whom petitioner gave his written statement on July 23, 1992 testified extensively at trial regarding the circumstances that culminated in petitioner giving of that statement. *Id.*, testimony of Vidal Resendez, at pp. 105–44. Petitioner's two-page, typewritten, statement given July 23, 1992, State Exhibit no. 17, appears at S.F. Trial, Volume 38, immediately following page 1392.

On July 24, 1992,[53] petitioner gave a second written statement to a different San Antonio Police Detective in which petitioner stated that (1) Mark Rodriguez had approached petitioner the week before the murder at the home of their mutual friend Sam Perez to discuss petitioner killing Mike's wife, (2) during their discussion, Mike Rodriguez drove up in a yellow Mercedes Benz and took them to the Taco House, where they discussed the killing, (3) after they ate, they left, (4) the Rodriguez brothers gave petitioner a .45 caliber automatic pistol during their drive to Macaroni's grill to scout out the location, (5) Mark took out the clip, which contained bullets, to show petitioner the gun and petitioner forgot to ask for the clip when the Rodriguez brothers dropped him off at the home of Chris Villarreal, (6) when petitioner arrived at Macaroni's the next evening to perform the murder, he saw a security guard, (7) on the night of the murder, Theresa looked at him and smiled before petitioner shot her, (8) after petitioner shot Theresa, Mike said "Oh my God" and Mike began yelling, (9) petitioner used a .357 revolver to shoot Theresa because the .45 caliber automatic the Rodriguez brothers had given him, which bore an Italian brand name, still had a serial number on it, (10) on the night of the murder, petitioner's Smith and Wesson .357 was loaded with a mixture of .38 and .357 caliber bullets, (11) after the murder, petitioner took his .357 to a friend named Pascual, who sold it for $100, which he and petitioner split, (12) the Sunday after the murder, petitioner left the .45 automatic at the home of his friend Rudy Espinoza, (13) petitioner spent all the money he received for killing Mike's wife on clothes and partying, (14) when his mother got suspicious as to why he had so much money, she threw him out of her house, and (15) the mother of petitioner's friend Chris saw petitioner counting his money and also appeared suspicious.[54]

Acting on the information petitioner furnished in his statement of July 24, 1992 regarding the two handguns, all of which proved to be accurate, San Antonio Police officers subsequently recovered both the .357 handgun petitioner had used to shoot Theresa Rodriguez, as well as the .45 caliber pistol sans clip.[55]

On July 27, 1992,[56] petitioner requested to speak with a San Antonio Police Detective and gave a third written statement in which petitioner stated that (1) Joe Ramon knew what petitioner was going to do and

**53.** A San Antonio Police Detective testified extensively regarding the circumstances which culminated in petitioner giving of his statement on July 24, 1992. S.F. Trial, Volume 32, testimony of James Holguin, at pp. 229–50.

**54.** Petitioner's written statement given on July 24, 1992 was admitted into evidence as State Exhibit no. 32 and read in open court. S.F. Trial, Volume 32, testimony of James Holguin, at pp. 238–43. Petitioner's two-page, type-written, statement given July 24, 1992, State Exhibit no. 32, appears in S.F. Trial, Volume 32, immediately following page 1407.

**55.** San Antonio Police recovered the .357 handgun on July 25, 1992 from persons to whom Pascual Solano had directed them. S.F. Trial, Volume 31, testimony of Vidal Resendez, at pp. 141–44. Police also later recovered the .45 automatic pistol based on the information petitioner furnished them in his July 24, 1992 statement. S.F. Trial, Volume 32, testimony of James Holguin, at pp. 243–44.

**56.** Detective Resendez testified that, after he interviewed petitioner's friend Joe Ramon, petitioner asked to speak with Resendez and that their discussion culminated in petitioner giving petitioner's third, and final, written statement concerning Theresa Rodriguez's murder. S.F. Trial, Volume 31, testimony of Vidal Resendez, at pp. 144–53.

drove with petitioner to Macaroni's restaurant on the night petitioner was first instructed to murder Theresa Rodriguez, (2) when he explained to Joe Ramon that he planned to kill Mike Rodriguez's wife, petitioner offered to give Ramon half of the money the Rodriguez brothers had promised petitioner and Ramon accepted, (3) Ramon went with petitioner to the movie theater the night the Rodriguez brothers failed to show up, (4) the night of the murder, petitioner, Ramon, and two girls went to the theater to kill Mike's wife, (5) Mike's Mercedes is a diesel and has a sun roof that had to be closed by hand, and (6) petitioner gave Ramon $300 of the first

thousand petitioner received and $400 from the second thousand.[57]

In addition to the petitioner's three, highly inculpatory, written statements summarized above, the prosecution presented evidence showing that (1) the Rodriguez brothers behaved very suspiciously on the night of the murder and falsely told police that the person who shot Theresa had also stolen her purse,[58] (2) the evening that petitioner had been directed to shoot Theresa at Macaroni's restaurant, the Rodriguez brothers behaved very strangely while they and Theresa ate dinner at that establishment,[59] (3) shortly before pe-

57. Petitioner's written statement given July 27, 1992 was admitted into evidence as State Exhibit no. 20 and read in open court. S.F. Trial, Volume 31, testimony of Vidal Resendez, at pp. 151–54. Petitioner's one-page, type-written, statement given July 27, 1992, State Exhibit no. 20, appears in S.F. Trial, Volume 38, immediately after page 1395.

58. A San Antonio Police Officer who arrived at the murder scene shortly after the shooting testified that (1) neither the victim's husband nor brother-in-law wanted to talk to him and walked off and avoided him whenever he attempted to question them, (2) he considered their uncooperative behavior to be suspicious, (3) Michael Rodriguez claimed that the shooter had taken his wife's purse, and (4) when the Rodriguez brothers' sister Melissa arrived, she blamed mark for the murder and accused one of his drug connections of playing a role in Theresa's murder. S.F. Trial, Volume 31, testimony of Raul Delgado, at pp. 18–27.

Another San Antonio Police officer who arrived at the scene shortly after the murder testified (1) the Rodriguez brothers gave conflicting descriptions of the shooter's race, the number of the assailants, and the get-away vehicle, (2) Mark Rodriguez would not maintain eye contact with him when he attempted to interview Mark, (3) the Rodriguez brothers said that Theresa's purse had been taken during a robbery/murder, and (4) neither brother appeared cooperative. Id., testimony of Steven Markgraf, at pp. 28–39.

The San Antonio Police officer who supervised the crime scene at 1118 Gray Oak testified that (1) Michael Rodriguez sobbed and

hyperventilated intermittently, whenever he attempted to approach him, (2) both Rodriguez brothers started sobbing uncontrollably whenever anyone attempted to talk with them but neither brother appeared to be shedding any tears, (3) both brothers were "out of control" and not furnishing coherent descriptions of the assailant, and (4) in 31 years on the force, he had never seen a victim's relatives behave in such a manner and believed they were faking. Id., testimony of Patrick Ray Kilough, at pp. 61–74.

A San Antonio Police Detective testified that (1) there were discrepancies between the Rodriguez brothers' accounts of the number of assailants and the get-away vehicle, (2) Mike Rodriguez gave several differing accounts of what he had seen and where he was located when the fatal shot was fired, (3) Mike Rodriguez told police that Theresa's Louis Vutton purse had been stolen in the robbery along with a backpack containing a Gucci purse and Gucci wallet, but (4) Mike's sister Melissa informed him that she had Theresa's Louis Vutton purse, which he obtained from her, and (5) Melissa also informed him that she had given a loaded .45 automatic clip to her brother Mark's attorney. Id., testimony of Vidal Resendez, at pp. 99–103.

59. An acquaintance of a friend of Theresa Rodriguez testified that (1) he and his girlfriend ate dinner with Theresa and the Rodriguez brothers at Macaroni's restaurant on the night in question, (2) the Rodriguez brothers went to the restroom together, sat by themselves, generally ignored Theresa throughout

titioner's arrest, the mother of petitioner's friend saw petitioner counting hundred dollar bills that appeared to her to total between $800 and $1,000,[60] and (4) shortly after his arrest, petitioner telephoned his friend from jail, spoke with his friend's mother, and confessed to her that he had killed "the girl from USAA" for the money.[61]

The medical examiner testified that Theresa Rodriguez died as a result of a single, close-range, gunshot wound to the head.[62] A firearms and tool mark expert testified that (1) the bullet removed from Theresa Rodriguez's body during her autopsy was, in his opinion, fired from the .357 handgun police recovered following petitioner's confession of July 24, 1992 and (2) the Smith and Wesson .357 was in good working condition and would not have fired accidentally.[63]

Taking the stand against his trial counsel's advice,[64] petitioner testified in pertinent part that (1) he never planned to kill anyone at Macaroni's restaurant and did not even know where it was located, (2) he

had not given any of the three written statements introduced into evidence by the prosecution but, instead, had merely signed blank statement forms to acknowledge that he had been given his *Miranda* warnings, (3) he did not place his initials next to any of the corrections on the three statements, (4) he had no contact with either Rodriguez brother until the night of the murder, (5) while he shot Theresa Rodriguez, he did so because he had ingested narcotics heavily that night and not because he had been paid to do so, (6) he had no motive for killing Theresa but did so simply because he was drunk, (7) all three of the written statements introduced against him were false, (8) he was not a member of the Texas Syndicate prison gang, although he had grown up with several persons who are members, and (9) the money he was seen counting around the time of the murder had been given to him by his family for his birthday or by his father to help him hire an attorney in an unrelated matter.[65]

the evening, and behaved as if they were a homosexual couple, and (3) Mike Rodriguez clearly was drunk when the couples left the restaurant that night. S.F. Trial, Volume 31, testimony of David Aslin, at pp. 196–202.

**60.** S.F. Trial, Volume 31, testimony of Lucy Sandoval Garza, at pp. 204–07.

**61.** *Id.*, testimony of Lucy Sandoval Garza, at pp. 216–17.

**62.** More specifically, the medical examiner testified that (1) Theresa suffered a single gunshot wound to the right side of her head, slightly above the ear and in front of the external auditory canal, (2) the bullet caused massive brain injuries as well as significant skull fractures, both on top the head and radiating down to the base of the brain, (3) gunpowder tattooing around the entrance wound indicated the muzzle was likely 3 inches from the skin when the gun was fired, (4) gunpowder residue on Theresa's hands indicated that she had raised both her hands

near the gun shortly before it was fired, (5) the bullet trajectory was down and slightly toward the back, where the bullet exited the skull posterior to the left ear and lodged in the neck muscles, (6) as the bullet exited the skull at the foramen magnum, it caused multiple fractures and nearly instantaneous death, and (7) the actual slug that killed Theresa was removed from her body during autopsy. S.F. Trial, Volume 32, testimony of Robert Charles Bux, at pp. 262–87.

**63.** S.F. Trial, Volume 33, testimony of Richard Stengel, at pp. 324–30.

**64.** The state trial court held a brief hearing outside the jury's presence during which petitioner acknowledged that he wanted and planned to testify despite his counsel's wishes and against his counsel's advice. S.F. Trial, Volume 33, at pp. 336–38.

**65.** S.F. Trial, Volume 33, testimony of Roland Ruiz, at pp. 340–490.

In rebuttal, the prosecution presented a Bexar County Sheriff's Department employee who witnessed petitioner's signatures on the written statements given on July 24 and July 27, 1992 and who testified that (1) she had never witnessed any inmate sign a blank statement form, (2) petitioner's statement forms were not blank when she witnessed his signatures on same, and (3) the standard practice is for officers to have her and other witnesses physically present when an inmate reads and corrects a written statement.[66] A Clerk with the Bexar County Sheriff's department who witnessed petitioner's signature on his written statement given July 27, 1992 testified that she had never signed a blank statement form as a witness.[67]

The San Antonio Police Detective who took petitioner's statements on July 23 and July 27 testified that (1) at the time petitioner gave police his statement on July 23, 1992, police were not aware the Rodriguez brothers and Theresa had been to Macaroni's restaurant on the Friday evening before the murder but subsequent investigation following petitioner's statement confirmed that fact, (2) at the time petitioner informed police that he had not stolen Theresa's purse, police believed the shooter had taken same from the crime scene, and (3) only after petitioner gave his statement on July 24, 1992 identifying the locations of the murder weapon and the .45 handgun the Rodriguez brothers gave to petitioner were police able to recover either of those weapons.[68]

Another San Antonio Police Detective testified that (1) until petitioner gave police his statement on July 24, 1992, police knew nothing regarding the caliber of the murder weapon, (2) petitioner's statement given that date led directly to the recovery of the murder weapon and the .45 caliber handgun, (3) inmates do not sign blank forms to acknowledge they have received their *Miranda* warnings but, rather, inmates sign and date a separate warning card, as petitioner before he gave each of his three written statements, and (4) two civilian employees of the Sheriff's department witnessed petitioner correct and sign his statement on July 24, 1992.[69]

A Bexar County Adult Detection Center ("BCADC") classification officer testified that (1) petitioner informed the officer that petitioner had become affiliated with the Texas Syndicate gang in May, 1992, (2) petitioner was experiencing problems in his unit with the Mexican Mafia prison gang and requested to be moved to a location within the BCADC where he would be housed with other Texas Syndicate gang members, (3) after conducting research, including interviewing known Texas Syndicate gang members, he approved petitioner's transfer to another part of the BCADC which housed Texas Syndicate gang members.[70] Thus, there was overwhelming evidence showing not only that petitioner fatally shot Theresa Rodriguez in exchange for payment of a modest sum by Theresa's husband but also that petitioner testified falsely when he denied knowing the Rodriguez brothers, denied receiving money for killing Theresa, and denied being a gang member.

66. S.F. Trial, Volume 33, testimony of Kathleen Plate, at pp. 498–507.

67. *Id.*, testimony of Cassandra Ladson, at pp. 508–12.

68. *Id.*, testimony of Vidal Resendez, at pp. 513–19.

69. *Id.*, testimony of Roland Casias, at pp. 532–61.

70. S.F. Trial, Volume 34, testimony of Albert J. Galindo, at pp. 593–605.

On January, 18, 1995, after deliberating barely over two hours, the jury returned its verdict, finding petitioner guilty of capital murder as charged in the indictment.[71]

### 3. *Punishment Phase of Trial*

At the punishment phase of trial, the prosecution presented a 19–year–old female friend of petitioner's testified that (1) in the days immediately after the murder, petitioner confessed to her that he had killed Theresa Rodriguez and (2) after petitioner's arrest, she successfully smuggled several marijuana joints into petitioner during her visits to petitioner at the Bexar County Adult Detention center ("BCADC").[72]

Three close friends of the petitioner testified the petitioner (1) knew and associated with Mark Rodriguez before Theresa Rodriguez's murder, (2) liked to fight, and (3) sometimes carried a gun.[73]

A police officer and an eyewitness testified about an incident on June 8, 1992 during which petitioner (1) pulled his girlfriend Roxanne Conway out of her vehicle, (2) beat and kicked Conway before throwing her to the ground, (3) stole Conway's vehicle, (4) within minutes thereafter led police on a brief chase before surrendering Conway's vehicle, which was missing both its air conditioner and stereo, and (5) casually told his arresting officer that he could do whatever he wanted to his girlfriend.[74]

The prosecution presented numerous witnesses who testified regarding petitioner's gang-related activities while in custody awaiting trial, including multiple incidents in which petitioner and other Texas Syndicate gang members acted in concert to assault other inmates or jail guards. More specifically, a BCADC classification officer testified that, on August 8, 1992, (1) petitioner informed him that he was a member of the Texas Syndicate prison gang, (2) petitioner requested to be moved to a part of the BCADC where members of that gang were housed, and (3) other Texas Syndicate gang members housed in the BCADC verified petitioner's claim to membership in that gang.[75] A pair of BCADC guards testified about an incident on September 6, 1992 in which petitioner and

---

**71.** Trial, Transcript, Volume 2, at pp. 450–60 & 464. The jury retired to deliberate at approximately 11:00 a.m. on January 18, 1995 and returned with its verdict at approximately 2:10 p.m. that same date. *Id.;* S.F. Trial, Volume 34, at pp. 666–68.

**72.** S.F. Trial, Volume 34, testimony of Sandra Rojas, at pp. 687–90.

**73.** More specifically, Samuel Perez, one of petitioner's friends, testified that the petitioner (1) liked to fight, (2) knew Mark Rodriguez, and (3) was once banned from his house for shooting a gun at one of Perez's neighbors. S.F. Trial, Volume 34, testimony of Samuel Perez, at pp. 703–18.

Another of petitioner's friends, Kristian Villarreal, with whom petitioner was living at the time of petitioner's arrest for Theresa Rodriguez's murder, testified that (1) petitioner met with Mark Rodriguez several times prior to Theresa's murder at the Taco House operated by Michael Rodriguez, (2) petitioner engaged in several drug deals with Robert Silva, and (3) following his arrest, petitioner asked Villarreal a question about Villarreal's mother which Villarreal construed as a threat. *Id.,* testimony of Kristian Villarreal, at pp. 719–32.

Petitioner's long-time close friend Rudolfo Espinoza, III, testified that (1) the petitioner hung around with a group of "bad boys" from their neighborhood, (2) petitioner definitely knew Mark Rodriguez, whom petitioner met on the day of Theresa Rodriguez's funeral, and (3) petitioner sometimes liked to carry a .357 handgun. *Id.,* testimony of Rudolfo Espinoza, III, at pp. 733–50.

**74.** S.F. Trial, Volume 34, testimony of Michelle Shook, at pp. 691–702; testimony of Michael Anders, at pp. 766–76.

**75.** S.F. Trial, Volume 35, testimony of Mark Gibson, at pp. 796–817.

other Texas Syndicate inmates assaulted guards and attempted to assault a black inmate who was being escorted through the day room in handcuffs.[76] A quartet of BCADC guards testified about an incident on April 21, 1993 in which petitioner and two other Texas Syndicate gang members refused to return to their cells and, when confronted by jail guards, assaulted a trio of BCADC guards, seriously injuring one of the guards.[77] Another BCADC guard testified about an incident on June 9, 1993 in which Petitioner charged out of his cell, attempted to assault another inmate, vigorously resisted the attempts of several guards to restrain him, and had to be wrestled to the floor.[78]

Finally, the prosecution presented a witness with over nine years experience investigating and helping to prosecute felony offenses committed in the Texas prison system, who testified that (1) he was very familiar with the Texas Syndicate prison gang, one of the more successful prison gangs in Texas, (2) the Texas Syndicate is organized along racial lines with primarily Hispanic and a few Anglo members and exercises its influence through fear and intimidation, (3) the Texas Syndicate is a deeply rooted, violent, prison gang that exercises influence both inside and outside the prison system, (4) a hired killer or someone who had a record of having killed would be considered a valuable asset to a prison gang like the Texas Syndicate, (5)

**76.** S.F. Trial, Volume 35, testimony of Jesse Alva, at pp. 785–92; testimony of Mark Harris, at pp. 793–96.

Officer Alva testified that petitioner, another Texas Syndicate gang member named Tony Coronado, and other Hispanic inmates assaulted Sergeant Ramos and a black inmate while the black inmate was being transported through the day room and that it took multiple officers, including the arrival of a Special Emergency Response Team, to finally quell the fighting. *Id.*, at pp. 788–90. Officer Harris testified that, the instant the door of the petitioner's BCADC living unit opened, petitioner and three other Texas Syndicate gang members rushed a black inmate named Stepnowski while Stepnowski was being escorted through the unit. *Id.*, at pp. 794–95.

**77.** S.F. Trial, Volume 35, testimony of Robert Johnson, at pp. 818–32; testimony of Jeremiah Bredvad, at pp. 833–44; testimony of Edward Santiago, at pp. 845–58; testimony of David Salinas, at pp. 859–75.

Officer Johnson testified that (1) petitioner and two other Texas Syndicate gang members, including Steve Samudia, refused to rack up when directed to do so, (2) petitioner grabbed him from behind while Samudia attacked him from the front, (3) all three men went to the floor, (4) petitioner then put Johnson in a headlock and repeatedly struck Johnson in the face with a fist while Samudia kicked Johnson, (5) other guards pulled Samudia off Johnson so that Johnson could de-

fend himself from petitioner, (6) while the three gang members assaulted Johnson and other guards, other inmates shouted "See what you get for messing with the Texas Syndicate," and (7) he sustained head injuries. *Id.*, at pp. 819–31.

Officer Bredvad testified that, on the date in question, (1) petitioner and fellow Texas Syndicate gang members Steve Samudia and (first name unknown) Castro assaulted himself, officer Johnson, and Corporal Santiago, (2) Santiago was cut over the left eye, (3) he sustained an abrasion and bruise under the right eye, and (4) a Special Emergency Response Team arrived to restore order. *Id.*, at pp. 836–40.

Corporal Santiago testified (1) on April 21, 1993 petitioner was housed in an administrative segregation unit within the BCADC, (2) petitioner, Castro, and Samudia assaulted officers Johnson and Bredvad and he left the unit office to assist them, (3) Castro struck him in the face, causing a deep laceration over the left eye which bled profusely and required several sutures to close, (4) while the three Texas Syndicate gang members assaulted the three guards, other inmates cheered and shouted "That's what you get for messing with the Texas Syndicate," as well as other things in Spanish, and (5) Castro is a known enforcer for the Texas Syndicate. *Id.*, at pp. 847–58.

**78.** S.F. Trial, Volume 34, testimony of Robert Gutierrez, at pp. 752–64.

while death row inmates are severely restricted and carefully scrutinized, inmates in the general prison population are allowed much greater freedom, and (6) prison gangs thrive on members who possess reputations for violence because it helps the gangs intimidate others.[79]

Petitioner's trial counsel presented a long-time friend of petitioner's family and one of petitioner's former high school teachers, both of whom testified they had never known petitioner to be violent and they were shocked by his arrest for capital murder.[80] Petitioner's former girlfriend Roxanne Conway testified that (1) petitioner was always "very sweet" and "caring" toward her, (2) petitioner had written her a letter apologizing for having assaulted her and stolen her vehicle, (3) she had forgiven petitioner because he had a drug problem, and (4) she did not believe petitioner deserved the death penalty.[81] On cross-examination, however, Conway was forced to admit (1) she had suffered severe facial and dental injuries in petitioner's assault upon her, which required her to receive five stitches in her mouth and undergo multiple dental surgeries, (2) she told police who arrived at the scene of her assault that she felt as if she had been fighting petitioner for her life, (3) for a while after petitioner assaulted her, she did not trust men, (4) she had gone to the District Attorney's office to demand petitioner be prosecuted for assaulting her and had never asked that those charges be

dismissed, and (5) when police recovered her stolen vehicle only minutes after petitioner assaulted her and took her vehicle, her vehicle's radio had been removed, several music disks had been taken, and the bumper was damaged.[82]

Petitioner's trial counsel also called a veteran Bexar County defense attorney who testified about her observations the night she attended the execution of one of her clients.[83] Petitioner's uncle and cousin testified they had never known petitioner to be violent, they were unaware of his drug problems, and they did not believe petitioner deserved to die.[84]

Finally, petitioner's mother testified petitioner (1) had a "normal" childhood and had displayed no behavior problems as a child, (2) began having problems at age 17 when he began abusing drugs, (3) was always a very respectful son and had once baked a cake for her, and (4) had expressed remorse for his crime, knew right from wrong, and was still a good person inside who deserved to live.[85] On cross-examination, however, petitioner's mother admitted that (1) when petitioner telephoned her from jail, he confessed to killing Theresa Rodriguez and (2) she had once kicked petitioner out of her house because she wanted him to get a job and be responsible for himself.[86]

Thus, petitioner's capital sentencing jury had before it overwhelming evidence showing petitioner's (1) history and demonstrated propensity for extreme violence, even

---

79. S.F. Trial, Volume 35, testimony of Royce Smithey, at pp. 926–50.

80. S.F. Trial, Volume 35, testimony of Tracy Gaston, at pp. 978–82; testimony of Michael T. Lipscomb, at pp. 1017–29.

81. S.F. Trial, Volume 35, testimony of Roxanne Conway, at pp. 984–95 & 1013.

82. *Id.*, at pp. 996–1011.

83. S.F. Trial, Volume 36, testimony of Nancy Barohn, at pp. 1083–93.

84. S.F. Trial, Volume 36, testimony of David Ruiz, at pp. 1098–1101; testimony of Laura Rodriguez, at pp. 1102–04.

85. S.F. Trial, Volume 36, testimony of Maria Rangel, at pp. 1106–28.

86. *Id.*, at pp. 1128–31.

against those with whom he was close, (2) propensity for violence even while incarcerated, (3) abject refusal to accept any responsibility for his murder-for-hire, and (4) history of drug abuse.

On January 20, 1995, after deliberating slightly more than ninety minutes, the jury returned its verdict, finding (1) beyond a reasonable doubt that there was a probability the petitioner would commit criminal acts of violence that would constitute a continuing threat to society and (2) taking into consideration all of the evidence, including the circumstances of the offense, the petitioner's character and background, and the petitioner's personal moral culpability, there were insufficient mitigating circumstances to warrant a sentence of life imprisonment rather than a death sentence.[87]

### B. Failure to Fully Investigate Petitioner's Background

Petitioner argues his trial counsel should have engaged in a more searching inquiry into petitioner's background to locate potentially mitigating evidence, i.e., admissible evidence which diminished petitioner's moral culpability or which would have otherwise assisted petitioner's trial counsel in obtaining a favorable jury verdict on any of the Texas capital sentencing special issues.

#### 1. Deficient Performance

■ In support of this contention, petitioner furnished the state habeas court and this Court with a series of affidavits from friends and family members purporting to establish the allegedly "horrific" nature of petitioner's childhood.[88] When called to testify at the evidentiary hearing held in November, 2010, however, all but a handful of these witnesses refused to offer any information based on personal knowledge supporting the statements contained in their affidavits.[89] On the contrary, with the exception of Mark Molina, this Court heard from none of petitioner's friends or family who were willing to support the claims in their affidavits with any specific facts of which they possessed personal knowledge. Instead, petitioner's family members testified primarily that the petitioner (1) spent the night on many occasions with relatives who lived a short distance from the residence petitioner shared with his mother Maria Rangel and his step-father Paul Rangel and (2) during his childhood, the petitioner lived at various times with his maternal grandmother and other members of his extended family.[90] Some of these witnesses also gave hearsay testimony that petitioner's maternal grandfather was an alcoholic who abused his daughters and immediate family; but they did not offer any specific facts showing petitioner was ever abused by his maternal grandfather. Thus, contrary to the assertions contained in petitioner's pleadings herein, there is no credible evidence now before this Court showing that any significant or substantial, additional, *admissible*, mitigating evidence concerning petitioner's background was available at the time of petitioner's trial. This conclu-

---

87. Trial Transcript, Volume 2, at pp. 476–77; S.F. Trial, Volume 36, at pp. 1246–47. The Court Reporter noted that petitioner's jury retired at approximately 4:13 p.m. to deliberate at the punishment phase of petitioner's trial and returned at 5:50 with its verdict.

88. These affidavits were attached to petitioner's subsequent state habeas corpus application, which was itself attached to petitioner's Rule 60(b) motion, *docket entry no. 40*, as well as to petitioner's Amended Federal Habeas Corpus Petition, *docket entry no. 70*.

89. *See notes 8–12, 15, 18, supra, and accompanying text.*

90. *Id.*

sion does not end this Court's inquiry into the deficient performance prong of *Strickland,* however.

This Court is mindful of the rule in this Circuit that "when a defendant blocks his attorney's efforts to defend him, including forbidding his attorney from interviewing his family members for purposes of soliciting their testimony as mitigating evidence during the punishment phase of the trial, he cannot later claim ineffective assistance of counsel." *Roberts v. Dretke,* 356 F.3d 632, 638 (5th Cir.2004), *cert. denied,* 544 U.S. 963, 125 S.Ct. 1726, 161 L.Ed.2d 606 (2005). While petitioner's former trial co-counsel attorney Donald Mach testified petitioner did not wish to have his family interviewed by his trial counsel,[91] there is no evidence in this case suggesting petitioner ever gave as clear and definitive a directive to his trial counsel not to interview petitioner's family members as did Roberts.

The deficient performance prong of *Strickland* focuses on the objective reasonableness of counsel's performance given all the information then reasonably available to petitioner's counsel. Petitioner's former trial counsel testified without contradiction at the evidentiary hearing before this Court that both petitioner and petitioner's mother denied petitioner had been abused as a child.[92] Said counsel also testified without contradiction that petitioner did not wish his trial counsel to speak with petitioner's family.[93] Respondent argues this testimony, combined with petitioner's own trial testimony in which petitioner categorically denied he had ever been abused as a child, rendered objectively reasonable the failure of petitioner's trial counsel to more fully interview petitioner's family. This Court concludes, however, that once petitioner's trial counsel came into possession of Dr. Munsinger's report (which suggested petitioner had an extensive history of childhood abuse, a long history of drug abuse, and possible cocaine dependence),[94] the failure of petitioner's trial counsel to further investigate petitioner's background beyond interviewing petitioner and petitioner's mother was anything but objectively reasonable. While petitioner's trial counsel did call a couple of petitioner's relatives to testify during the punishment phase of petitioner's trial, the testimony before this Court establishes petitioner's trial counsel made no significant attempt to question any of these witnesses about their personal knowledge of petitioner's childhood or family life.[95]

Dr. Munsinger's report concluded, in pertinent part, that (1) petitioner's early family life was marked by frequent quarrels and physical fights between his par-

---

91. FEH Transcript, Volume 1, testimony of Donald Mach, at PP. 44–45.

92. *Id.,* at pp. 71–72, 94–97.

93. *Id.,* at pp. 44–45.

94. Petitioner's Exhibit 15, at pp. 2–4.

95. FEH Transcript, Volume 1, testimony of David Ruiz, at pp. 206–08, 212, 214–20; Volume 2, testimony of Laura Rodriguez Chapa, at pp. 248–49, 259. Petitioner's surviving trial counsel did testify without contradiction that he interviewed petitioner's mother, petitioner's high school basketball coach, and possible another, unidentified, relative of petitioner. FEH Transcript, Volume 1, testimony of Donald Mach, at pp. 24, 37–39, 42–44, 71–73, 91, 94–97. There is no credible evidence currently before this Court establishing petitioner's trial counsel contacted or interviewed any members of petitioner's family, other than those whom petitioner's trial counsel actually called to testify during petitioner's trial. This Court finds there is credible evidence all of the members of petitioner's family who testified before this Court in November, 2010 were readily availability to testify at the time of petitioner's capital murder trial.

ents, (2) petitioner was likely to display erratic and unpredictable behavior and have trouble controlling his impulses, (3) petitioner was deficient in social skills and uncomfortable being alone, (4) petitioner may have difficulty differentiating between fantasy and reality, (5) petitioner was experiencing significant depression and was prone to alcohol and drug abuse, (6) petitioner had a history of alcohol and street drug abuse, including cocaine, LSD, marijuana, and crank, which dated back five years (7) petitioner was dependent on cocaine and amphetamines, (8) petitioner *was physically abused as a child*, immature, and did not perform well in social situations, and (9) petitioner was likely to experience periods of obsessive suicidal ideation.[96] This Court concludes the failure of petitioner's trial counsel to further explore petitioner's family background after receiving Dr. Munsinger's report was objectively unreasonable. Dr. Munsinger identified numerous potential areas deserving of careful scrutiny by petitioner's trial counsel.[97] There is no credible evidence before this Court establishing petitioner's trial counsel ever made any effort whatsoever to further explore or investigate petitioner's background beyond accepting at face value petitioner's and petitioner's mother's assertions that petitioner had never been abused, following said counsel's receipt of Dr. Munsinger's report. In short, once Dr. Munsinger informed petitioner's trial counsel that he had discovered evidence suggesting petitioner had been abused as a child, it was objectively unreasonable for petitioner's trial counsel to have relied on the word of petitioner and petitioner's mother (who might well have possessed self-serving reasons for denying such abuse) in limiting the scope of their investigation into petitioner's background. It is a sad reality that those who have been abused as children and those who participate in, or are witnesses to, such abuse within the family setting frequently deny that such abuse occurred. Given the clear indications in Dr. Munsinger's report that petitioner suffered from the classic symptoms of a deprived or abused childhood, it was objectively unreasonable for petitioner's trial counsel not to have further investigated petitioner's background beyond simply interviewing petitioner and his mother and accepting their denials of abuse at face value.

Attorney Mach's assertions in his affidavit and testimony before this Court that he found "nothing mitigating" in Dr. Munsinger's report is beyond merely incredible; it is inane. According to Dr. Mun-

---

**96.** Petitioner's Exhibit 15, at pp. 2–4; FEH Transcript, Volume 2, testimony of Dr. Harry Munsinger, at pp. 302–56.

A copy of Dr. Munsinger's report dated October 14, 1993 was attached to petitioner's subsequent state habeas corpus application, which was attached to petitioner's Amended Petition, filed January 20, 2009, docket entry no. 70. Another copy of Dr. Munsinger's report was admitted as Petitioner's Exhibit no. 15 during the evidentiary hearing before this Court.

**97.** Dr. Silverman testified in pertinent part that Dr. Munsinger's report would have been useful to a forensic psychiatric exploration of the petitioner's background. FEH Transcript,

Volume 1, testimony of Dr. Seth Silverman, at pp. 392–93. This Court finds not merely objectively unreasonable but utterly incomprehensible the failure of petitioner's trial counsel to follow up with further investigation into petitioner's background once said counsel received Dr. Munsinger's report. Dr. Munsinger's conclusions and findings varied dramatically from the information petitioner's trial counsel testified had been presented to said counsel by petitioner and petitioner's mother. In such circumstances, petitioner's trial counsel could not have reasonably relied upon the information about petitioner's childhood related to said counsel by petitioner and petitioner's mother.

singer's report, petitioner displayed clear indications of clinical depression, deficient social skills, suicidal ideation, a tendency toward drug and alcohol abuse, a lack of maturity, feelings of insecurity and inferiority, low self-esteem and self-confidence, and a tendency toward alternating periods of excessive drinking and promiscuity followed by expressions of guilt and self-condemnation.[98] Dr. Munsinger also concluded in his report that petitioner lacked effective psychological defenses and might withdraw into fantasy when subjected to severe stress.[99] Dr. Munsinger credibly testified before this Court that, had he been contacted by petitioner's trial counsel, he (Dr. Munsinger) would have advised said counsel of his willingness to testify at trial that petitioner was suffering from substance-induced diminished capacity at the time of petitioner's offense.[99] If attorney Mach and his co-counsel at trial, the late Karen Amos, truly failed to discern the potential for any mitigating value in Dr. Munsinger's conclusions (as well as the corresponding need for further investigation into petitioner's background), then said counsel behaved in an objectively unreasonable manner. Any reasonably proficient attorney confronted with conclusions similar to Dr. Munsinger's should have reasonably perceived the potential for discovering mitigating evidence through an investigation into petitioner's background that went beyond merely interviewing the petitioner and his mother.

Yet there is no credible evidence before this Court establishing that petitioner's trial counsel ever undertook any investigation into petitioner's background beyond interviewing the petitioner and his mother. This Court finds wholly credible Dr. Munsinger's testimony before this Court that he was not interviewed or contacted by petitioner's trial counsel after he submitted his written report to said counsel.[100] Numerous members of petitioner's family whom any reasonably competent trial counsel should reasonably have contacted in the course of even a rudimentary investigation into the defendant's background and character testified without contradiction before this Court that they were never contacted by any representative of the petitioner's trial defense team.[101] Under such circumstances, this Court concludes the conduct of petitioner's trial counsel, in failing to undertake a more searching investigation into petitioner's background (particularly with regard to allegations of physical abuse of petitioner as a child), was objectively unreasonable. *See Wiggins v. Smith*, 539 U.S. at 523, 123 S.Ct. at 2536 (holding the proper analysis under the first prong of *Strickland* is an objective review of the reasonableness of counsel's performance under prevailing professional norms which includes a context-dependent consideration of the challenged conduct as seen from the perspective of said counsel at the

---

**98.** Petitioner's Exhibit 15, at pp. 2–4; FEH Transcript, Volume 2, testimony of Dr. Harry Munsinger, at pp. 313–16, 318, 322–23, 325, 327–28, 332–33, 343–45, 347–49, 355–57.

**99.** Petitioner's Exhibit 15, at pp. 2–4.

**99.** FEH Transcript, Volume 2, testimony of Dr. Harry Munsinger, at pp. 314, 322–23, 325, 327–28, 330, 332, 347–49, 355–57.

**100.** FEH Transcript, Volume 2, testimony of Dr. Harry Munsinger, at p. 304.

This Court expressly finds attorney Mach's testimony before this Court that he contacted Dr. Munsinger after reading Dr. Munsinger's report to be incredible. Dr. Munsinger testified before this Court in a wholly credible manner that he was never contacted by petitioner's trial counsel after he forwarded his written report to said counsel. Dr. Munsinger had no reason to obfuscate or otherwise misrepresent that fact to this Court.

**101.** *See notes 8–12, supra.*

time). Petitioner has, therefore, satisfied the deficient performance prong of the *Strickland* test.

### 2. *No Prejudice*

In evaluating prejudice in the context of the punishment phase of a capital trial, a federal habeas court must re-weigh all the evidence in aggravation against the totality of available mitigating evidence (had the petitioner's trial counsel chosen a different course). *Wong v. Belmontes,* —— U.S. at ——, 130 S.Ct. at 386; *Wiggins v. Smith,* 539 U.S. at 534, 123 S.Ct. at 2542. *Strickland* does not require the State to "rule out" or negate a sentence of life in prison to prevail; rather, it places the burden on the defendant to show a "reasonable probability" that the result of the punishment phase of a capital murder trial would have been different. *Wong v. Belmontes,* —— U.S. at ——, 130 S.Ct. at 390–91. As explained above, the prosecution presented considerable evidence during the punishment phase of trial establishing petitioner's demonstrated history of violent conduct, reputation for violence, and participation in violent gang-related activities during his pretrial detention. *Ruiz v. Dretke,* 2005 WL 2146119, *5.

Moreover, petitioner took the stand during the guilt-innocence phase of his trial and denied he committed Theresa's murder as part of a murder-for-hire scheme.[102] Petitioner also denied he executed any of his three written statements to police and proceeded to deny line-by-line virtually every factual assertion contained in his three statements.[103] Instead, while admitting he had done so, petitioner insisted he was so heavily intoxicated at the time he fatally shot Theresa Rodriguez he could not recall shooting her.[104] Petitioner also vehemently denied he had ever been involved in a gang.[105] Thus, despite petitioner's repeated assertions that he was "accepting responsibility" for his crime,[106] petitioner *actually displayed the antithesis of sincere contrition and remorse for his crime throughout his trial testimony.*

Petitioner asserts that a wealth of additional mitigating evidence concerning petitioner's background would have been discovered had his trial counsel followed up on Dr. Munsinger's report and undertaken a more thorough investigation into petitioner's background. Yet petitioner has neither controverted nor otherwise challenged the testimony of petitioner's former trial counsel that both petitioner and petitioner's mother denied to said counsel that petitioner had been abused as a child. Likewise, petitioner has not furnished any credible evidence suggesting that further pretrial interviews by petitioner's trial counsel of either petitioner or petitioner's mother would have produced any additional admissible mitigating evidence. Thus, this Court's prejudice analysis must focus on other possible sources of potentially mitigating evidence, such as petitioner's other family members and friends.

This Court is mindful that petitioner's trial counsel did not completely fail to present a case in mitigation. At the punishment phase of trial, petitioner's trial

---

102. S.F. Trial, Volume 33, testimony of Rolando Ruiz, Jr., at pp. 350–54, 358–61, 365, 371, 383–84, 400–01, 437–38, 440, 442, 450, 485, 488, 490.

103. *Id.,* at pp. 350–409, 424–51.

104. *Id.,* at pp. 358–61, 364–66, 380, 399–400, 427–29, 439–40, 459–60, 465–66, 477.

105. *Id.,* at pp. 408, 417–22, 424–25.

106. *Id.,* at pp. 357–61, 364–66, 380–81, 383–85, 398–400, 406, 427–28, 439–40, 442, 448, 459–60, 477, 482–83.

counsel called petitioner's mother (Maria Rangel), a female cousin (Laura Rodriguez), an uncle (David Ruiz), a female friend of petitioner (Tracy Gaston), and a former teacher and coach of petitioner (Michael Lipscomb), all of whom testified to the petitioner's non-violent nature and positive character traits. *Ruiz v. Dretke*, 2005 WL 2146119, *6. Petitioner's mother did admit petitioner had a history of drug abuse but insisted petitioner was remorseful for his crime.[107]

Petitioner's trial counsel also called petitioner's former girlfriend, Roxanne Conway to testify at the punishment phase of trial about, among other things, petitioner's heavy drinking problem and "sweet and caring" nature.[108] As was explained above, however, any potentially beneficial aspects from Conway's testimony were more than offset by her admissions on cross-examination that the petitioner had savagely beaten her, leaving her afraid of men (petitioner in particular) and with injuries that required her to undergo multiple surgeries.[109]

The lone witness from petitioner's family who testified before this Court from personal knowledge about alleged physical abuse and drug use during petitioner's childhood, i.e., petitioner's cousin Mark Molina, testified in pertinent part that (1) he personally witnessed petitioner being beaten on one occasion (by petitioner's mother when Molina and petitioner were young boys), (2) petitioner was "kicked out of the house" on multiple occasions by petitioner's mother and step-father Paul Rangel for cussing and refusing to get a job, (3) petitioner abused alcohol and marijuana beginning in his early teen years (but Molina did not recall the petitioner having a problem with alcohol), and (4) petitioner joined a street gang when petitioner was seventeen because petitioner believed the gang members were his only friends.[110] At best, Molina could have identified only one instance of alleged physical abuse (of unspecified severity) in petitioner's childhood had he been called to testify at petitioner's trial.[111] Moreover, while Molina could have corroborated petitioner's trial testimony asserting petitioner's long-term drug abuse, Molina would also have had the potential to undermine petitioner's credibility even further by advising the jury the petitioner had, in fact, voluntarily joined a gang while petitioner was still a teenager.[112] This, insofar as Molina could have furnished potentially double-edged mitigating evidence regarding petitioner's long-term drug abuse, Molina would also have potentially damaged petitioner by controverting petitioner's trial testimony denying any gang involvement.

Another of petitioner's new witnesses, his aunt Griselda Gutierrez, also would have furnished, at best, testimony which had the potential to hurt petitioner as much as it might have helped him. Ms. Gutierrez testified before this Court that she visited petitioner in jail while the petitioner was awaiting trial on his capital murder charge and the petitioner related to Mr. Gutierrez that (1) one of the Rodriguez brothers was his friend, (2) this Rodriguez brother pressured petitioner into

---

**107.** S.F. Trial, Volume 36, testimony of Maria Rangel, at pp. 1106–28.

**108.** S.F. Trial, Volume 35, testimony of Roxanne Conway, at p. 995.

**109.** *Id.*, at pp. 997–1003.

**110.** FEH Transcript, Volume 2, testimony of Mark Molina, at pp. 284, 286–87, 289, 292–93, 295–97.

**111.** *Id.*, at p. 295.

**112.** *Id.*, at pp. 286–87, 292–93.

committing the murder of Theresa Rodriguez, and (3) he (the petitioner) took money from his victim's husband, used that money to acquire drugs, and used drugs extensively in the days leading up to the murder for the purpose of getting up the courage to commit the murder.[113] Ms. Gutierrez also testified that she was unaware of any physical abuse or alcoholism in the home in which petitioner lived as an infant and she had no knowledge of petitioner's alleged teenage drug abuse.[114] While Ms. Gutierrez did relate several hearsay stories about the bad conditions in his home told her by petitioner when petitioner was a young boy, she never claimed to possess any personal knowledge regarding any of those incidents.[115] She also possessed no personal knowledge regarding any alleged mental problems displayed by petitioner's mother.[116] Thus, Ms. Gutierrez's testimony before this Court would not have afforded petitioner any significant benefit and might well have harmed petitioner by contradicting petitioner's denials that he had murdered Theresa Rodriguez for remuneration.[117]

Two of petitioner's trial witness, i.e., petitioner's cousin Laura Rodriguez Chapa and petitioner's uncle David Ruiz, also appeared before this Court but offered no new testimony concerning petitioner's character or background.[118]

The record before this Court is not completely bereft of at least some, new, mitigating evidence, however. Petitioner's aunt Rosa Ruiz testified that, when petitioner was four or five years old, (1) petitioner's mother attempted suicide by cutting herself, (2) petitioner's mother stayed one night in the hospital following that attempt, and (3) petitioner was present in the apartment during that attempt.[119] Ms. Ruiz also testified petitioner's mother hit petitioner a lot and made a second suicide attempt by swallowing pills when petitioner was fourteen or fifteen.[120] Significantly, Ms. Ruiz did not testify that petitioner had actually witnessed either of his mother's suicide attempts or that he personally observed the aftermath of either attempt. Ms. Ruiz did testify petitioner never received any psychological counseling after either of his mother's suicide attempts.[121] Petitioner did not offer any credible testimony before this Court establishing that petitioner personally witnessed either of his mother's suicide attempts or that he suffered any traumatic effects as a result of his mother's suicide attempts.[122] Ms.

---

113. FEH Transcript, Volume 1, testimony of Griselda Gutierrez, at pp. 118–21.

114. *Id.,* at pp. 117, 123.

115. *Id.,* at pp. 110–15.

116. *Id.,* at p. 123.

117. Insofar as petitioner contends Mr. Gutierrez could have testified about (1) the lack of food inside petitioner's home and (2) an incident in which petitioner claimed he was sent to a bathroom or made to face the wall while his mother had intercourse with an unidentified man, petitioner ignores the fact Ms. Gutierrez denied any personal knowledge of those incidents and testified before this Court that she only knew what petitioner had told her about same. *Id.,* at pp. 110–15.

118. *Compare* S.F. Trial, Volume 36, testimony of David Ruiz, at pp. 1098–1101; and Volume 36, testimony of Laura Rodriguez, at pp. 1102–04, with FEH Transcript, Volume 1, testimony of David Ruiz, at pp. 197–220; and Volume 2, testimony of Laura Rodriguez Chapa, at pp. 247–60.

119. FEH Transcript, Volume 1, testimony of Rosa Ruiz, at pp. 171–74.

120. *Id.,* at pp. 169–70, 174–75.

121. *Id.,* at pp. 173–75.

122. There is no evidence before this Court, in the form of medical records (or testimony from petitioner or another person possessing personal knowledge) establishing the petition-

Ruiz also denied ever seeing any bruises or other injuries on petitioner.[123]

Ms. Ruiz also testified petitioner's mother sent petitioner out to purchase marijuana when petitioner was a teenager.[124] Petitioner offered no evidence showing precisely when or how often he allegedly purchased marijuana for his mother or how being directed to make such illegal purchases impacted petitioner mentally, emotionally, or developmentally.

Another one of petitioner's new witnesses, a former neighbor named Yolanda Mendoza, testified (1) she saw petitioner sleeping outside his aunt's residence on a porch late at night twice when petitioner was eight or nine years old but (2) she had never seen petitioner being physically abused or doing drugs.[125] Ms. Mendoza offered no insight into the circumstances which led to petitioner sleeping out on his aunt's porch on either of those two occasions. Several witnesses testified the petitioner lived only a short distance from his aunt's apartment during at least some of his youth.[126]

Petitioner also called petitioner's former trial counsel, Donald Mach, who testified before this Court in pertinent part that (1) petitioner denied any history of abuse, (2) the petitioner's mother informed Mach during interviews that, while petitioner had suffered "neglect" throughout his childhood, petitioner had not been abused, (3) petitioner's mother informed Mach that she kicked petitioner out of the house (at an unspecified age) for abusing alcohol, (4) petitioner's mother never informed Mach that she had made suicide attempts or had been institutionalized, (5) petitioner did not want his trial counsel to speak with his family, (6) shortly after Mach's representation of petitioner began, lead defense counsel—the late Karen Amos, took over primary responsibility for all communications with petitioner and petitioner's family, (7) initially petitioner gave a written confession to police and admitted to both his trial counsel and a friend (who testified for the prosecution) that he committed the capital offense as charged, i.e., a murder for hire, but petitioner then changed his story to assert, incredibly in Mach's view, that he (petitioner) had randomly shot the victim while intoxicated, (8) Mach consulted with Dr. Harry Munsinger regarding petitioner's mental health but Mach chose not to call Munsinger to testify after reading Munsinger's report because Mach did not believe the potential benefits of Munsing-

---

123. FEH Transcript, Volume 1, testimony of Rosa Ruiz, at p. 181. Petitioner failed to present this Court with any medical records showing petitioner was ever treated for any injury attributed to any physical abuse he allegedly suffered at the hands of his mother or either of his step-fathers.

er has ever been examined or treated for any mental health issues relating to his mother's suicide attempts. Petitioner had ample opportunity to obtain and present this Court with petitioner's medical and mental health records from petitioner's almost two decades in the custody of the Texas Department of Criminal Justice's Institutional Division, as well as petitioner's medical and mental health records from petitioner's pretrial detention at the BCADC.

124. *Id.*, at p. 191. Ms. Ruiz did not claim to have any personal knowledge of these alleged incidents but, rather, claimed petitioner's mother had related those incidents to her. *Id.*

125. FEH Transcript, Volume 1, testimony of Yolanda Garcia Mendoza, at pp. 151–59.

126. FEH Transcript, Volume 1, testimony of Ramon Ruiz, at pp. 221–23; Volume 2, testimony of Laura Rodriguez Chapa, at pp. 151–52; Volume 2, testimony of Angela Ruiz, at pp. 262–64; Volume 2, testimony of Mark Molina, at pp. 289–90.

er's testimony out-weighed the potential downside, (9) Mach decided not to call Munsinger to testify, in part, because the videotape of a jail riot in the possession of the prosecution effectively undermined Munsinger's favorable conclusions regarding petitioner's propensity for future violence, (10) the defense team called family members to testify during the punishment phase of trial in an attempt to "humanize" the petitioner, and (11) Mach believed petitioner's mother's demeanor would make a favorable impression on the jury.[127]

Dr. Munsinger prepared a written report based upon his evaluation of petitioner prior to petitioner's capital murder trial. Petitioner presented this Court with Dr. Munsinger's report, as well as Dr. Munsinger's testimony. Petitioner's principal contention, and the gist of the Fifth Circuit's rationale for remanding this cause to this Court, is that petitioner's trial counsel failed to present petitioner's capital sentencing jury with either Dr. Munsinger's testimony or any other evidence allegedly available at the time of petitioner's trial which corroborated the potentially mitigating aspects of Dr. Munsinger's report and conclusions. Dr. Munsinger, who is also a licensed attorney, testified (1) he met with petitioner for about three hours to do a clinical interview, perform a number of psychological tests (including the MMPI–2), and evaluate petitioner, (2) he reviewed none of the petitioner's school or medical records, (3) he did not speak with any of petitioner's family members, (4) while petitioner told Munsinger that he (petitioner) had been intoxicated at the time of the offense, petitioner did not state either precisely what drugs he consumed immediately prior to his offense or that he (petition-

er) had taken drugs to get his courage up to commit the offense, (5) Munsinger intentionally did not question petitioner about the facts of petitioner's offense, (6) petitioner reported he suffered from blackouts, abuse as a child, a dysfunctional family, and drug abuse, (7) Munsinger was unaware of (a) petitioner's mother's suicide attempts, (b) petitioner's mother having been institutionalized, or (c) petitioner's mother's allegedly promiscuous lifestyle, (8) Munsinger believed petitioner to be clinically depressed, (9) Munsinger believed there was mitigating evidence the petitioner suffered from diminished capacity at the time of his offense (due to petitioner's drug abuse and the fact petitioner came from a dysfunctional family), (9) Munsinger's references in his report to petitioner's "breaks with reality" referred to petitioner's assertions that he had blacked out and could not remember specific events occurring during specific time periods, (10) petitioner reported the use of LSD, cocaine, crack, amphetamines, and alcohol but not specifically at the time of the offense, and (11) petitioner reported himself as a habitual drug user.[128] Significantly, the only source of information on which Dr. Munsinger relied in preparing his pretrial report evaluating petitioner was the petitioner himself.

While petitioner did present this Court with some additional, potentially mitigating evidence during the evidentiary hearing held November 2–3, 2010, that evidence fell substantially short of establishing that petitioner's childhood was as "horrific" as that described by Dr. Silverman during his testimony before this Court. Contrary to petitioner's assertions, there is no credible evidence

---

**127.** FEH Transcript, Volume 1, testimony of Donald Mach, at pp. 24–25, 27, 29–33, 36–40, 42–45, 49, 71–73, 78–79, 83–91, 93–97.

**128.** FEH Transcript, Volume 2, testimony of Dr. Harry Munsinger, at pp. 310–16, 318, 321–23, 325, 327–28, 330–33, 340, 342–45, 347–49, 352–53, 355–59.

before this Court establishing that petitioner was routinely starved or physically abused as a child. Likewise, while there was testimony petitioner's biological parents divorced when petitioner was very young and the petitioner thereafter spent considerable portions of his youth living with relatives other than his mother, there is simply no credible evidence showing the petitioner's home life was as "horrific" as Dr. Silverman believed. There was anecdotal hearsay testimony the petitioner's mother sent petitioner out (at an unspecified age on unspecified occasions) to acquire marijuana for her.[129] But petitioner offered no direct evidence showing either the specific circumstances of those episodes or how those alleged purchases impacted petitioner. There is no credible evidence before this Court establishing that petitioner personally observed or was even aware of his mother's first suicide attempt when petitioner was four or five years old or how his mother's second suicide attempt, which took place when petitioner was in his mid-teens, impacted petitioner. Petitioner offered no direct testimony or other evidence showing how either of those events impacted his development. Nor did petitioner offer this Court any direct evidence showing precisely how he was affected by his admittedly unstable family life. Petitioner's refusal to testify during the hearing held in this Court deprived most of his anecdotal evidence about his childhood of any true mitigating value.

Petitioner did present this Court with a modicum of additional mitigating evidence, including testimony showing (1) petition-

er's childhood was characterized by frequent periods during which petitioner lived with financially challenged relatives other than his biological mother, (2) his mother made two suicide attempts during petitioner's youth, and (3) his mother (on unspecified occasions) sent petitioner out to purchase marijuana for her. This additional mitigating evidence must be viewed in proper context, i.e., in the context of petitioner's trial testimony (in which he categorically denied he was abused as a child) and in view of the circumstances of petitioner's offense. Petitioner was convicted of a cold-blooded contract killing. Instead of accepting responsibility for his offense, as petitioner's trial counsel accurately described it, petitioner took the stand at trial and gave an account of his offense that was not only inconsistent with all of petitioner's prior written statements to police but wholly incredible.[130]

Petitioner's new witnesses also furnished this Court with testimony establishing (1) petitioner admitted to Griselda Gutierrez not only that he had committed Theresa Rodriguez's murder for money but that he knew one of the Rodriguez brothers prior to becoming involved in the murder-for-hire plot (contrary to petitioner's trial testimony in which he denied knowing either of the Rodriguez brothers or accepting money to kill Theresa),[131] (2) he deliberately ingested large quantities of drugs in the days before Theresa's murder to help him acquire the courage necessary to execute an unarmed woman at point blank range (implicitly controverting petitioner's trial testimony in which he asserted he could not remember shooting There-

---

129. FEH Transcript, Volume 1, testimony of Rosa Ruiz, at p. 191.

130. FEH Transcript, Volume 1, testimony of Donald Mach, at pp. 86–90.

131. FEH Transcript, Volume 1, testimony of Griselda Gutierrez, at pp. 118–21.

sa),[132] (3) he had joined a street gang while a teenager (contrary to his trial testimony denying any gang involvement whatsoever),[133] and (4) petitioner and his cousin Mark Molina regularly snuck out of there residences late at night, abused drugs, and abused alcohol beginning in their mid-teens.[134] As such, the new mitigating evidence brought before this Court by petitioner's friends and family members that would have been admissible at petitioner's trial constitutes a mixed bag, at best. The testimony of petitioner's aunt Griselda Gutierrez effectively undermined the mitigating value of any expert opinion testimony suggesting petitioner was addicted to cocaine at the time of his offense by establishing that petitioner deliberately took cocaine prior to committing Theresa's for the very purpose of rendering himself capable of committing that heinous act.

 This Court is left with the fact the petitioner took the stand at his trial and (1) categorically denied he had suffered any abuse as a child, (2) insisted he chose to live with his aunts and grandparents, (3) categorically denied he had murdered Theresa Rodriguez for remuneration, (4) repeatedly denied he had executed any of his three written statements (attested to by numerous prosecution eyewitnesses who claimed to have witnessed petitioner's execution of his written statements), (5) claimed to have come from a good family, and (6) instead, blamed his criminal offense on his history of long-term drug and alcohol abuse and his cocaine intoxication on the night of Theresa's murder.[135] In contrast to petitioner's lengthy and argumentative trial testimony, petitioner's silence during the evidentiary hearing held

before this Court was deafening. Petitioner has the burden of proving both prongs of the *Strickland* test. *Rogers v. Quarterman*, 555 F.3d at 489; *Blanton v. Quarterman*, 543 F.3d at 235; *Montoya v. Johnson*, 226 F.3d at 408. The doctrine of res *ipsa loquitur* does not apply in the context of a federal habeas corpus proceeding.

Having spoken in such definitive terms during the guilt-innocence phase of his capital murder his trial to deny he had suffered any abuse as a child, to prevail on his ineffective assistance claims herein, petitioner owed this Court a rational explanation for the diametrically opposing accounts of his childhood he gave to his trial counsel and capital sentencing jury, on the one hand, and to Dr. Munsinger and Dr. Silverman, on the other. There is no allegation, much less any evidence, currently before this Court establishing there was anything humanly possible petitioner's trial counsel could have done to prevent petitioner from taking the stand at trial and testifying in the devastatingly self-destructive manner petitioner chose to do so.

Dr. Munsinger and Dr. Silverman testified they believed petitioner was acutely intoxicated at the time of his capital offense and possibly addicted to cocaine. However, petitioner's aunt Griselda Gutierrez testified without contradiction (in a wholly credible manner) before this Court that petitioner told her he obtained money for drugs from one of the Rodriguez brothers and used that money to acquire large quantities of drugs which he consumed in the days leading up to Theresa Rodriguez's murder for the very purpose of helping him build the courage necessary to

---

132. *Id.*

133. FEH Transcript, Volume 2, testimony of Mark Molina, at p. 293.

134. *Id.*, at pp. 284, 286–87, 292.

135. S.F. Trial, Volume 33, testimony of Rolando Ruiz, Jr., at pp. 341–45, 357–61, 366, 385, 399–400, 439–40, 442, 465–66, 471.

commit his capital offense.[136] Ms. Gutierrez's uncontradicted testimony effectively undermines any potentially mitigating impact of Dr. Munsinger and Dr. Silverman's testimony concerning petitioner's long-term drug abuse and possible cocaine addiction at the time of petitioner's offense. Evidence of drug addiction is, in an ordinary case, a double-edged sword in the context of a capital sentencing proceeding. Where, as here, there is credible evidence a petitioner voluntarily consumed large quantities of drugs for the *very purpose* of enabling himself to commit his capital offense, the potentially mitigating impact of evidence showing the petitioner was addicted to drugs or alcohol is diminished dramatically.

By remaining silent during his evidentiary hearing in this Court and, thereby, failing to explain why he offered his trial counsel and his capital sentencing jury one description of his childhood and Dr. Munsinger and Dr. Silverman a vastly different account of his childhood, petitioner failed to carry his burden of showing a reasonable probability that, but for his trial counsel's failure to more thoroughly additional investigate petitioner's background, the outcome of the punishment phase of petitioner's capital murder trial would have been different. Because petitioner's trial testimony and the trial testimony of petitioner's mother undermined the factual basis for the opinions of Dr. Munsinger and Dr. Silverman, those experts' opinions carry very little weight in this Court's view. Neither petitioner nor his mother testified before this Court in a manner inconsistent with their testimony at petitioner's trial.

Petitioner's belligerent demeanor throughout his trial testimony effectively undermined any realistic hope petitioner's trial counsel might have had to obtain a life sentence for petitioner based upon a showing the petitioner had experienced such severe abuse and neglect as to warrant a reasonable juror's affirmative answer to the "mitigating evidence" Texas capital sentencing special issue.[137] In light of the circumstances of petitioner's offense and the other aggravating evidence then before petitioner's capital sentencing jury, even if petitioner had presented his capital sentencing jury with all of the new mitigating evidence petitioner's federal habeas counsel presented to this Court, there is not even a remote possibility, much less a reasonable probability, the outcome of the punishment phase of petitioner's capital murder trial would have been different.

### 3. Conclusions

Petitioner's trial counsel behaved in an objectively unreasonable manner when, following their receipt of Dr. Munsinger's report, they failed to interview any members of petitioner's family beyond the petitioner and the petitioner's mother. Even the most minimally competent trial counsel should have recognized Dr. Munsinger's report warranted further investigation into petitioner's background because, among other things, petitioner apparently gave Dr. Munsinger a very different account of his childhood and background than petitioner gave his trial counsel. Dr. Silverman reasonably concluded Dr. Munsinger's report would have furnished a forensic mental health expert with many avenues

---

**136.** FEH Transcript, Volume 1, testimony of Griselda Gutierrez, at pp. 118–21.

**137.** Petitioner's former trial co-counsel testified without contradiction that petitioner failed to demonstrate sincere remorse for his offense during his trial testimony and, instead, furnished an account of his offense that was wholly incredible. FEH Transcript, Volume 1, testimony of Donald Mach, at pp. 86–90.

deserving further inquiry.[138] Even Dr. Munsinger himself recognized his report demonstrated the need for further investigation into petitioner's background and mental health.[139]

Nonetheless, when viewed in the context of (1) the truly callous, cold-blooded, nature of petitioner's offense, including (a) the modest sum (two thousand dollars) petitioner was willing to accept for taking an innocent human being's life and (b) the fact petitioner and his accomplice Joe Ramon took a couple of young women with them when they stalked and murdered Theresa Rodriguez, (2) petitioner's involvement in no less than three violent, gang-related, assaults on jail guards and other inmates while petitioner was awaiting trial for capital murder (the very time a criminal defendant could rationally be expected to be on his best behavior), (3) petitioner's abject to refusal before his jury to demonstrate sincere remorse or truly accept responsibility for his offense (by denying under oath the accuracy of virtually every factual assertion contained in any of his three written statements), (4) petitioner's participation in a conspiracy to smuggle marijuana into the Bexar County Adult Detection Center ("BCADC") during petitioner's pretrial detention, and (5) petitioner's demonstrated history of extreme violence toward even those with whom he had a close personal relationship (Roxanne Conway), petitioner's meager new mitigating evidence simply does not establish a reasonable probability that, but for the failure to petitioner's trial counsel to more thoroughly investigate petitioner's background (by interviewing those of petitioner's friends and family members who testified before this Court), the outcome of the punishment phase of petitioner's capital murder trial would have been different. The meager new mitigating evidence furnished by petitioner during the evidentiary hearing held in November, 2010 is undermined by the testimony of Griselda Gutierrez and pales in comparison to the overwhelming evidence showing petitioner's propensity for future violence and utter lack of sincere remorse for his offense.

Petitioner's first assertion of ineffective assistance satisfies the deficient performance prong of *Strickland* but does not satisfy the prejudice prong of *Strickland*. Petitioner's first ineffective assistance claim does not warrant federal habeas corpus relief.

## C. *Failure to Call Munsinger or Present Dr. Munsinger's Report*

Petitioner also complains that his trial counsel failed to either introduce Dr. Munsinger's report into evidence or call Dr. Munsinger to testify during the punishment phase of petitioner's capital murder trial.

### 1. *No Deficient Performance*

■ Petitioner's surviving trial counsel Donald Mach testified before this Court that he viewed any potential benefit that might arise from calling Dr. Munsinger to testify with regard to petitioner's allegedly diminished prospect for future violence would have been more than offset by the fact the prosecution had in its possession and was prepared to play for petitioner's capital sentencing jury a videotape of one of the jail riots in which petitioner participated.[140] In Mach's view, Dr. Munsinger's conclusions suggesting petitioner had suf-

---

138. FEH Transcript, Volume 2, testimony of Dr. Seth Silverman, at pp. 392–93.

139. FEH Transcript, Volume 2, testimony of Dr. Harry Munsinger, at pp. 322–23, 327.

140. FEH Transcript, Volume 1, testimony of Donald Mach, at pp. 25, 27, 79, 83–87, 89–90.

fered a history of abuse were controverted by petitioner's denials and the petitioner's mother's denial that petitioner had ever suffered any abuse as a child.[141] Petitioner has failed to present any credible evidence establishing that, under the circumstances of petitioner's capital murder trial, either of these two views were objectively unreasonable.

 Weighing the advantages and disadvantages of calling a particular witness to testify is a matter usually left within the province of trial counsel's discretion.

Claims that counsel failed to call witnesses are not favored on federal habeas review because the presentation of witnesses is generally a matter of trial strategy and speculation about what witnesses would have said on the stand is too uncertain. *See Alexander v. McCotter*, 775 F.2d 595, 602 (5th Cir.1985). For this reason, we require petitioners making claims of ineffective assistance based on counsel's failure to call a witness to demonstrate prejudice by "nam[ing] the witness, demonstrat[ing] that the witness was available to testify and would have done so, set[ting] out the content of the witness's proposed testimony, and show[ing] that the testimony would have been favorable to a particular defense." *Day v. Quarterman*, 566 F.3d 527, 538 (5th Cir.2009). This requirement applies to both uncalled lay and expert witnesses. *Id.*

*Woodfox v. Cain*, 609 F.3d 774, 808 (5th Cir.2010)

The issue for this Court is whether, under the circumstances as they existed at the time of petitioner's trial, attorney Mach's subjective decision not to call Dr. Munsinger to testify at trial was objectively reasonable. Attorney Mach testified credibly that he read Dr. Munsinger's report and, based thereon, did not believe any benefit to petitioner would accrue from having Dr. Munsinger testify in the manner set forth in his report.[142] While Dr. Munsinger did opine that he believed the petitioner would be unlikely to behave violently once placed in a secure environment all but devoid of alcohol and illicit drugs, attorney Mach reasonably concluded there was overwhelming evidence of petitioner's propensity for further violence, even when incarcerated. Even Dr. Munsinger recognized that evidence showing petitioner had engaged in multiple violent acts while in custody awaiting trial would likely have undermined his opinions concerning petitioner's likelihood of being nonviolent once removed from drugs and alcohol.[143] Attorney Mach testified without contradiction he believed introducing Dr. Munsinger's opinions regarding petitioner's allegedly reduced risk of future dangerousness might provoke the prosecution to introduce the videotape of one of the riots in which petitioner participated.[144] Petitioner introduced no evidence before this Court showing attorney Mach's concern was unjustified or unreasonable.

**141.** *Id.*, at pp. 38, 71–73, 94–97.

**142.** FEH Transcript, Volume 2, testimony of Donald Mach, at pp. 25, 27, 83–86, 89–90. This Court finds incredible that portion of attorney Mach's testimony in which he asserted that he either met with or telephoned Dr. Munsinger to discuss the report on petitioner. Dr. Munsinger testified in a credible manner that he was never contacted by anyone from petitioner's defense team after he sent petitioner's trial counsel his written report. FEH Transcript, Volume 2, testimony of Harry Munsinger, at p. 304.

**143.** FEH Transcript, Volume 2, testimony of Dr. Harry Munsinger, at pp. 358–59.

**144.** FEH Transcript, Volume 1, testimony of Donald Mach, at pp. 79, 84–86.

This Court takes judicial notice of the fact BCADC Special Emergency Response Teams routinely videotape their activities. It was undisputed at petitioner's trial that petitioner participated in not less than three violent gang-related altercations while awaiting trial for capital murder. *Ruiz v. Dretke*, 2005 WL 2146119, *5 & nn. 27–30. Thus, there appears to be nothing objectively unreasonable with petitioner's trial counsels' decision that Dr. Munsinger's testimony would be of little help in obtaining a jury verdict favorable to petitioner on the "future dangerousness" Texas capital sentencing special issue. Mach reasonable concluded petitioner's participation in the riot at the jail and other violent altercations while awaiting trial "blew away" Dr. Munsinger's speculative prognostication that petitioner would be non-violent if incarcerated.

Dr. Munsinger's report recites on its face that he obtained no information from any third-party. Thus, his conclusions therein were necessarily based upon information furnished to him by petitioner or from petitioner's answers to the standardized tests Dr. Munsinger administered to petitioner. Mach testified he believed the disadvantages of calling Dr. Munsinger as a witness at trial included Dr. Munsinger's characterizations of petitioner as antisocial and outweighed any potential benefits to the defense.[145] Having witnessed Dr. Munsinger's testimony firsthand in November, 2010, this Court finds Mach's belief to have been objectively reasonable. While Dr. Munsinger did make statements in his report suggesting petitioner (based on input from petitioner) had been abused as a child, Dr. Munsinger's report was also replete with references to petitioner's antisocial tendencies (i.e., "he is immature, passive-dependent, does not get along well in social situations, and avoids deep emotional involvement" and "likely to feel suspicious and distrustful of others, avoid emotional ties, and have few social skills").[146] Dr. Munsinger also mentioned that *petitioner reported* hallucinations associated with LSD abuse and blackouts (with associated amnesia) associated with excessive use of alcohol.[147] Nonetheless, Dr. Munsinger found petitioner oriented for person, place, and time, and his memory to be intact.[148]

▮ Dr. Munsinger did conclude petitioner (1) "was most likely suffering from a psychoactive substance dependence at the time of the alleged offense and, as a result, his judgment and ability to control his behavior was significantly diminished," and (2) "probably committed the alleged offense while suffering from significantly reduced mental capacity resulting from voluntary use of drugs or other intoxicants."[149] However, in the context of a capital sentencing proceeding, evidence of voluntary intoxication is at best a double-edged sword. *See Skinner v. Quarterman*, 528 F.3d 336, 342 (5th Cir.2008)(holding the failure to introduce double-edged evidence is not deficient performance), *cert. denied,* —— U.S. ——, 130 S.Ct. 1689, 176 L.Ed.2d 187 (2010); *Boyle v. Johnson*, 93 F.3d 180, 188 (5th Cir.1996)(holding heavy deference is owed

**145.** *Id.*, at pp. 25, 27, 79, 83–86.

**146.** Petitioner's Exhibit 15, at p. 2.

**147.** FEH Transcript, Volume 2, testimony of Dr. Harry Munsinger, at pp. 315, 318, 343–45.

**148.** Petitioner's Exhibit 15, at p. 3.

**149.** Petitioner's Exhibit 15, at p. 4. Dr. Munsinger reiterated these conclusions during his testimony before this court. FEH Transcript, Volume 2, testimony of Dr. Harry Munsinger, at pp. 313–16, 318, 322–23, 325, 328, 332–33, 345, 347–49, 355–56.

trial counsel when deciding whether to forego admitting evidence of a double-edged nature which might harm the defendant's case), *cert. denied,* 519 U.S. 1120, 117 S.Ct. 968, 136 L.Ed.2d 853 (1997).

Petitioner himself testified during the guilt-innocence phase of trial that he had ingested significant quantities of marijuana and cocaine on the night he fatally shot Theresa Rodriguez.[150] Petitioner also testified he had abused alcohol and drugs for many years prior to the offense, including use of marijuana from age twelve.[151] Petitioner also claimed to have been so intoxicated on the night of the murder, he was unable thereafter to specifically recall shooting Theresa Rodriguez.[152] Of course, these assertions must be viewed in the context of the testimony of (1) the trial testimony of prosecution witnesses Lucy Sandoval and Sandra Rojas, both of whom testified that, in the days after his arrest, the petitioner admitted to them he had killed Theresa Rodriguez [153]; and (2) the testimony before this Court of Griselda Gutierrez, who testified she visited petitioner in jail while he was awaiting trial and petitioner admitted to her (a) he knew one of the Rodriguez brothers, (b) the Rodriguez brothers had paid him and then pressured him to commit the murder, and (c) as a result, he ingested large quantities of drugs for many days to get up the courage to commit the murder.[154]

In view of the unchallenged evidence before petitioner's capital sentencing jury (and now before this Court) establishing petitioner voluntarily self-medicated him-self in the days preceding the murder, and the potentially detrimental aspects of Dr. Munsinger's conclusions regarding petitioner's antisocial tendencies, this Court finds it was objectively reasonable for petitioner's trial counsel not to present Dr. Munsinger's opinions and conclusions, as contained in his written report, to petitioner's capital sentencing jury. The potential beneficial aspects of Dr. Munsinger's conclusions, i.e., those addressing petitioner's acute intoxication (on an unspecified substance) at the time of petitioner's capital offense, were already before the jury by virtue of petitioner's guilt-innocence phase trial testimony. Moreover, Dr. Munsinger's conclusions in that regard were based exclusively upon petitioner's representations and highly speculative in nature. Dr. Munsinger admitted as much during his testimony before this Court when he testified he made no effort to secure information concerning the circumstances of petitioner's offense from any third-party and he made a conscious decision not to discuss the circumstances of petitioner's offense with petitioner.[155] Moreover, at least some of Dr. Munsinger's conclusions possessed double-edged qualities, i.e., those conclusions regarding petitioner's long-term voluntary substance abuse, antisocial personality tendencies, suicidal ideation, and tendency toward erratic behavior. *See Hopkins v. Cockrell,* 325 F.3d 579, 586 (5th Cir.2003)("As for the alcohol and drug abuse, this Court has repeatedly denied claims of ineffective assistance of

---

150. S.F. Trial, Volume 33, testimony of Rolando Ruiz, Jr., at pp. 358–61, 366, 380–81, 385, 427, 439–40, 459–60, 465–66.

151. *Id.,* at pp. 344–45, 361, 385, 471.

152. *Id.,* at pp. 358–59, 366, 380–81, 427, 439–40, 459–60.

153. *S.F.* Trial, Volume 31, testimony of Lucy Sandoval, at pp. 204–07; Volume 34, testimony of Sandra Rojas, at pp. 687–90.

154. FEH Transcript, Volume 1, testimony of Griselda Gutierrez, at pp. 118–21.

155. FEH Transcript, Volume 2 testimony of Dr. Harry Munsinger, at pp. 302, 313, 318, 321–23, 325, 327, 330, 332, 345, 348–49.

counsel for failure to present 'double edged' evidence where counsel has made an informed decision not to present it."), *cert. denied,* 540 U.S. 968, 124 S.Ct. 430, 157 L.Ed.2d 314 (2003); *Boyle v. Johnson,* 93 F.3d at 188 (recognizing such evidence possesses the potential to both help and harm a defendant during a capital sentencing proceeding). It was objectively reasonable for petitioner's trial counsel to conclude calling Dr. Munsinger to testify at the punishment phase of petitioner's trial (in the same manner set forth in Dr. Munsinger's report) posed more potential pitfalls than potential benefit.

Insofar as petitioner complains about his trial counsel's failure to introduce Dr. Munsinger's report itself, the same analysis applies. In addition, petitioner has failed to identify any provision of the Texas Rules of Evidence under which Dr. Munsinger's report would have been admissible at the punishment phase of petitioner's capital murder trial in the absence of Dr. Munsinger himself.

### 2. *No Prejudice*

▆▆▆ When viewed in the context of (1) the truly callous, cold-blooded, nature of petitioner's offense, including (a) the modest sum (two thousand dollars) petitioner was willing to accept for taking an innocent human being's life and (b) the fact petitioner and his accomplice Joe Ramon took a couple of young women with them when they stalked and murdered Theresa Rodriguez, (2) petitioner's involvement in no less than three violent, gang-related, assaults on jail guards and other inmates while petitioner was awaiting trial for capital murder (the very time a criminal defendant could rationally be expected to be on his best behavior), (3) petitioner's abject to refusal before his capital sentencing jury to truly accept responsibility for his offense (by denying under oath the accuracy

of virtually every factual assertion contained in any of his three written statements), (4) petitioner's conspiracy to smuggle marijuana into the Bexar County Adult Detention Center ("BCADC") during petitioner's pretrial detention, and (5) petitioner's demonstrated history of extreme violence toward even those with whom he had a close personal relationship (Roxanne Conway), the new mitigating evidence now before this Court simply does not establish a reasonable probability that, but for the failure to petitioner's trial counsel to petitioner's complaints about his trial counsel's failures to either introduce Dr. Munsinger's report or call Dr. Munsinger to testify at the punishment phase of petitioner's capital murder trial, the outcome of that phase of petitioner's trial would have been different. Dr. Munsinger's potentially beneficial conclusions were highly speculative in nature, largely redundant of petitioner's guilt-innocence phase trial testimony, and inextricably intertwined with a plethora of potentially disadvantages opinions and conclusions concerning petitioner's antisocial tendencies and voluntary substance abuse. Dr. Munsinger's potentially helpful opinions and conclusions pale in comparison to the overwhelming evidence showing petitioner's propensity for future violence and utter lack of sincere remorse for his offense. Further, Dr. Munsinger's prediction the petitioner would be unlikely to engage in future acts of violence if incarcerated was proven utterly fallacious by petitioner's repeated participation in coordinated, gang-related, acts of violence inside the BCADC during petitioner's pretrial detention, a fact Dr. Munsinger candidly admitted during his testimony before this Court.[156]

### 3. *Conclusions*

Petitioner's complaints about his trial counsel's failures to either introduce Dr.

---

**156.** FEH Transcript, Volume 2, testimony of Dr. Harry Munsinger, at pp. 358–59.

Munsinger's report or call Dr. Munsinger to testify at the punishment phase of petitioner's capital murder trial fail to satisfy either prong of *Strickland* analysis. These aspects of petitioner's ineffective assistance claims do not warrant federal habeas relief.

### D. *Failure to Further Investigate Petitioner's Mental Health*

Petitioner also complains that his trial counsel failed to adequately investigate petitioner's mental health following receipt of Dr. Munsinger's report.

#### 1. *Deficient Performance*

■ For reasons similar to those set forth at length in Section V.B.1. above, the failure of petitioner's trial counsel to seek additional mental health evaluation of petitioner after reviewing Dr. Munsinger's report fell below an objective level of reasonableness. Dr. Silverman testified in a wholly credible manner before this Court that Dr. Munsinger's report contained a wealth of information that would have been useful to a forensic psychiatrist seeking mitigating evidence on petitioner's behalf.[157] Dr. Munsinger's report strongly suggested petitioner suffered from psychoactive substance abuse at the time of petitioner's capital offense.[158] Dr. Munsinger testified in a credible manner before this Court that, had he been given an opportunity to do so, he would have urged petitioner's trial counsel to conduct further investigation into petitioner's mental health.[159] Yet, after receiving and reviewing Dr. Munsinger's report, petitioner's trial counsel made no effort whatsoever to investigate further into petitioner's mental health. This Court finds such failure to be objectively unreasonable.

#### 2. *No Prejudice*

■ Nonetheless, after reviewing all the evidence presented by petitioner during the evidentiary hearing held in November, 2010, this Court finds this complaint fails to satisfy the prejudice prong of *Strickland*. Dr. Munsinger's conclusions and opinions during his testimony before this Court were not significantly different from those contained in his written report. For the most part, Dr. Silverman concurred in Dr. Munsinger's opinions and conclusions and added, like Dr. Munsinger, he believed petitioner was dependent on cocaine at the time of his offense and would benefit from the stabilizing aspects of incarceration.[160] However, as explained above, petitioner's capital sentencing jury already had before it substantial evidence of petitioner's professed cocaine intoxication at the time of petitioner's offense, as well as petitioner's assertions that he had abused marijuana since age 12 and had indulged in various other street drugs for many years prior to his fatal shooting of Theresa Rodriguez. Furthermore, Dr. Silverman's testimony must be viewed in the context of Griselda Gutierrez's unchallenged testimony before this Court that the petitioner told her he had voluntarily consumed large quantities of cocaine in the days leading up to his capital offense for the *very purpose* of getting the courage to commit the crime.[161] Dr. Munsinger con-

---

**157.** FEH Transcript, Volume 2, testimony of Dr. Seth Silverman, at pp. 392–93.

**158.** Petitioner's Exhibit 15, at p. 4.

**159.** FEH Transcript, Volume 2, testimony of Dr. Harry Munsinger, at pp. 322–23, 327.

**160.** FEH Transcript, Volume 2, testimony of Dr. Seth Silverman, at pp. 367–69, 375–83, 387–90.

**161.** FEH Transcript, Volume 1, testimony of Griselda Gutierrez, at pp. 118021.

ceded evidence showing petitioner took large doses of drugs for the very purpose of committing his crime would tend to show the murder of Theresa Rodriguez was a voluntary act, rather than one brought on by a lack of impulse control.[162] In this regard, Ms. Gutierrez's credible testimony before this Court undermined the potentially mitigating value of Dr. Munsinger's and Dr. Silverman's testimony showing (1) petitioner was acutely intoxicated at the time of his offense and (2) petitioner was addicted to cocaine at the time of petitioner's capital offense.

When viewed in the context of (1) the truly callous, cold-blooded, nature of petitioner's offense, including (a) the modest sum (two thousand dollars) petitioner was willing to accept for taking an innocent human being's life and (b) the fact petitioner and his accomplice Joe Ramon took a couple of young women with them when they stalked and murdered Theresa Rodriguez, (2) petitioner's involvement in no less than three violent, gang-related, assaults on jail guards and other inmates while petitioner was awaiting trial for capital murder (the very time a criminal defendant could rationally be expected to be on his best behavior), (3) petitioner's abject to refusal before his capital sentencing jury to express sincere remorse or to truly accept responsibility for his offense (by denying under oath the accuracy of virtually every factual assertion contained in any of his three written statements), (4) petitioner's conspiracy to smuggle marijuana into the Bexar County Adult Detection Center ("BCADC") during petitioner's pretrial detention, and (5) petitioner's demonstrated history of extreme violence toward even those with whom he had a close personal relationship (Roxanne Conway), the evidence now before this Court simply does not establish a reasonable probability that, but for the failure to petitioner's trial counsel to further investigate petitioner's mental health and to obtain and present expert mental health testimony similar to that offered to this Court by Dr. Munsinger and Dr. Silverman, the outcome of the punishment phase of petitioner's capital murder trial would have been different.

Like Dr. Munsinger's opinions and conclusions, Dr. Silverman's potentially beneficial conclusions were highly speculative in nature, largely redundant of petitioner's guilt-innocence phase trial testimony, and inextricably intertwined with a plethora of potentially disadvantages opinions and conclusions concerning petitioner's antisocial tendencies. Moreover, the reliability of Dr. Munsinger's and Dr. Silverman's opinions on petitioner's future dangerousness if incarcerated were significantly undermined by the overwhelming evidence showing petitioner's participation with other Texas Syndicate gang members in three coordinated gang-related assaults on other inmates and jail guards during petitioner's pretrial detention. Dr. Munsinger's and Dr. Silverman's potentially helpful opinions and conclusions pale in comparison to the overwhelming evidence showing petitioner's propensity for future violence and utter lack of sincere remorse for his offense.

### 3. *Conclusions*

Petitioner's complaint about his trial counsel's failure to further investigate petitioner's mental health following receipt of Dr. Munsinger's report satisfies the deficient performance prong of *Strickland* but does not satisfy the prejudice prong of *Strickland*. Therefore, this complaint

---

**162.** FEH Transcript, Volume 2, testimony of Dr. Harry Munsinger, at p. 358.

does not warrant federal habeas corpus relief.

## VI. *Certificate of Appealability*

### A. *The Necessity for Obtaining a CoA*

 The AEDPA converted the "certificate of probable cause" previously required as a prerequisite to an appeal from the denial of a petition for federal habeas corpus relief into a "Certificate of Appealability" ("CoA"). *See Hill v. Johnson,* 114 F.3d 78, 80 (5th Cir.1997)(recognizing the "substantial showing" requirement for a CoA under the AEDPA is merely a change in nomenclature from the CPC standard); *Muniz v. Johnson,* 114 F.3d 43, 45 (5th Cir.1997)(holding the standard for obtaining a CoA is the same as for a CPC). The CoA requirement supersedes the previous requirement for a certificate of probable cause to appeal for federal habeas corpus petitions filed after the effective date of the AEDPA. *Robison v. Johnson,* 151 F.3d 256, 259 n. 2 (5th Cir.1998), *cert. denied,* 526 U.S. 1100, 119 S.Ct. 1578, 143 L.Ed.2d 673 (1999); *Hallmark v. Johnson,* 118 F.3d 1073, 1076 (5th Cir.1997), *cert. denied sub nom. Monroe v. Johnson,* 523 U.S. 1041, 118 S.Ct. 1342, 140 L.Ed.2d 502 (1998). Effective December 1, 2009, Rule 11(a) of the Rules Governing Section 2254 Cases in United States District Courts requires this Court to issue or deny a CoA when it enters an order adverse to a federal habeas corpus petitioner.

 Under the AEDPA, before a petitioner may appeal the denial of a habeas corpus petition filed under Section 2254, the petitioner must obtain a CoA. *Miller–El v. Cockrell,* 537 U.S. 322, 335–36, 123 S.Ct. 1029, 1039, 154 L.Ed.2d 931 (2003); 28 U.S.C. § 2253(c)(2). Likewise, under the AEDPA, appellate review of a habeas petition is limited to the issues on which a CoA is granted. *See Crutcher v. Cockrell,* 301 F.3d 656, 658 n. 10 (5th Cir.2002)(holding a CoA is granted on an issue-by-issue basis, thereby limiting appellate review to those issues); *Jones v. Cain,* 227 F.3d 228, 230 n. 2 (5th Cir.2000)(holding the same); *Lackey v. Johnson,* 116 F.3d 149, 151 (5th Cir.1997)(holding the scope of appellate review of denial of a habeas petition limited to the issues on which CoA has been granted). In other words, a CoA is granted or denied on an issue-by-issue basis, thereby limiting appellate review to those issues on which CoA is granted alone. *Crutcher v. Cockrell,* 301 F.3d at 658 n. 10; *Lackey v. Johnson,* 116 F.3d at 151; *Hill v. Johnson,* 114 F.3d at 80; *Muniz v. Johnson,* 114 F.3d at 45; *Murphy v. Johnson,* 110 F.3d 10, 11 n. 1 (5th Cir.1997); 28 U.S.C. § 2253(c)(3).

### B. *The Standard for Obtaining a CoA*

 A CoA will not be granted unless the petitioner makes a substantial showing of the denial of a constitutional right. *Tennard v. Dretke,* 542 U.S. 274, 282, 124 S.Ct. 2562, 2569, 159 L.Ed.2d 384 (2004); *Miller–El v. Cockrell,* 537 U.S. at 336, 123 S.Ct. at 1039; *Slack v. McDaniel,* 529 U.S. 473, 483, 120 S.Ct. 1595, 1603, 146 L.Ed.2d 542 (2000); *Barefoot v. Estelle,* 463 U.S. 880, 893, 103 S.Ct. 3383, 3394, 77 L.Ed.2d 1090 (1983).

 To make such a showing, the petitioner need not show he will prevail on the merits but, rather, must demonstrate that reasonable jurists could debate whether (or, for that matter, agree) the petition should have been resolved in a different manner or that the issues presented are adequate to deserve encouragement to proceed further. *Tennard v. Dretke,* 542 U.S. at 282, 124 S.Ct. at 2569; *Miller–El v. Cockrell,* 537 U.S. at 336, 123 S.Ct. at 1039; *Slack v. McDaniel,* 529 U.S. at 484, 120 S.Ct. at 1604; *Barefoot v. Estelle,* 463 U.S. at 893 n. 4, 103 S.Ct. at 3394 n. 4. This Court is required to issue or deny a CoA when it enters a final Order such as this

one adverse to a federal habeas petitioner. *Rule 11(a), Rules Governing Section 2254 Cases in the United States District Courts.*

■ The showing necessary to obtain a CoA on a particular claim is dependent upon the manner in which the District Court has disposed of a claim. If this Court rejects a prisoner's constitutional claim on the merits, the petitioner must demonstrate reasonable jurists could find the court's assessment of the constitutional claim to be debatable or wrong. "[W]here a district court has rejected the constitutional claims on the merits, the showing required to satisfy § 2253(c) is straightforward: The petitioner must demonstrate that reasonable jurists would find the district court's assessment of the constitutional claims debatable or wrong." *Miller–El v. Cockrell,* 537 U.S. at 338, 123 S.Ct. at 1040 *(quoting Slack v. McDaniel,* 529 U.S. at 484, 120 S.Ct. at 1604). *Accord Tennard v. Dretke,* 542 U.S. at 282, 124 S.Ct. at 2569. In a case in which the petitioner wishes to challenge on appeal this Court's dismissal of a claim for a reason not of constitutional dimension, such as procedural default, limitations, or lack of exhaustion, the petitioner must show jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right *and* whether this Court was correct in its procedural ruling. *See Slack v. McDaniel,* 529 U.S. at 484, 120 S.Ct. at 1604 (holding when a district court denies a habeas claim on procedural grounds, without reaching the underlying constitutional claim, a CoA may issue only when the petitioner shows that reasonable jurists would find it debatable whether (1) the claim is a valid assertion of the denial of a constitutional right and (2) the district court's procedural ruling was correct).

■ In death penalty cases, any doubt as to whether a CoA should issue must be resolved in the petitioner's favor. *Avila v.*

*Quarterman,* 560 F.3d 299, 304 (5th Cir.), *cert. denied,* —— U.S. ——, 130 S.Ct. 536, 175 L.Ed.2d 350 (2009); *Moore v. Quarterman,* 534 F.3d 454, 460 (5th Cir.2008); *Foster v. Quarterman,* 466 F.3d 359, 364 (5th Cir.2006); *Dickson v. Quarterman,* 462 F.3d 470, 476 (5th Cir.2006); *Pippin v. Dretke,* 434 F.3d 782, 787 (2005); *Bridgers v. Dretke,* 431 F.3d 853, 861 (5th Cir.2005), *cert. denied,* 548 U.S. 909, 126 S.Ct. 2961, 165 L.Ed.2d 959 (2006).

■ Nonetheless, a CoA is not automatically granted in every death penalty habeas case. *See Miller–El v. Cockrell,* 537 U.S. at 337, 123 S.Ct. at 1040 ("It follows that issuance of a COA must not be *pro forma* or a matter of course."); *Sonnier v. Quarterman,* 476 F.3d at 364–69 (denying CoA on a wide variety of challenges to the Texas capital sentencing scheme).

### C. *Synthesis*

This Court ruled in petitioner's favor when it applied a *de novo* standard of review to petitioner's claims herein on remand. Thus, petitioner is not entitled to a CoA on that procedural issue.

■ Reasonable jurists could not disagree with this Court's conclusion that all of petitioner's ineffective assistance claims herein fail to satisfy the prejudice prong of *Strickland.* There was overwhelming evidence supporting the jury's verdict at the punishment phase of petitioner's capital murder trial. At best, petitioner has presented this Court with new or additional mitigating evidence which was either cumulative of his own trial testimony or inherently double-edged in nature. Petitioner effectively painted his trial counsel into a corner by taking the stand at the guilt-innocence phase of trial and asserting that (1) he had never been abused as a child and (2) he had come from a "normal" family. While there was evidence avail-

able at the time of petitioner's trial showing petitioner grew up as a neglected "pass-around" child who lived as often with his grandparents or other relatives as he did with his biological mother, petitioner presented this Court with no credible evidence showing petitioner was physically abused or subjected to any more "abuse" or deprivations than were his many cousins who testified before this Court, most of whom have never been in trouble with the law. In fact, the evidence of severe abuse and neglect petitioner presented to this Court consisted almost exclusively of hearsay statements made to various relatives by petitioner himself when he was a child, which statements petitioner effectively refuted during his own trial testimony.

Petitioner's federal habeas counsel filed pleadings and presented this Court with affidavits which asserted all manner of horrors occurred during petitioner's childhood. However, the witness who actually testified before this Court not only failed to substantiate the most extreme of these allegations, they admitted they possessed no personal knowledge of any physical abuse of petitioner. The few witnesses who did claim to have personally witnessed the physical abuse of petitioner testified in only vague term about when the alleged abuse occurred and did not offer any eyewitness testimony regarding any injuries petitioner sustained as a result of the alleged abuse. There is a complete absence of medical records in this cause establishing petitioner ever sustained any physical injuries as a result of the physical abuse his relatives alleged before this Court. Petitioner himself failed to testify before this Court about any alleged abuse he claimed to have sustained as a child.

Despite the passage of more than a decade and a half since petitioner's 1995 conviction, petitioner presented this Court with no credible evidence showing there was anything petitioner's trial counsel could have done to save petitioner's life after petitioner took the witness stand at the guilt-innocence phase of trial and insulted the intelligence of every member of his jury by denying not only that he murdered Theresa Rodriguez in exchange for two thousand dollars but also the factual accuracy of virtually every sentence contained in petitioner's written statements to the police. Petitioner assured the outcome of his capital murder trial when he testified in a manner which his own trial counsel accurately described as highly self-destructive. Once petitioner left the witness stand at the guilt-innocence phase of his trial, for all intents and purposes, his fate was sealed.[163] Nothing petitioner's trial counsel could have done thereafter would likely have altered the outcome of the punishment phase of petitioner's capital murder trial. Petitioner's trial counsel attempted to use petitioner's mother and several other punishment-phase witnesses to "humanize" petitioner but petitioner's own testimony effectively precluded his trial counsel from doing so.[164] Petitioner's federal habeas counsel argue that, with the benefit of hindsight, petitioner's trial counsel should have attempted to save petitioner's life by effectively throwing petitioner's mother under the bus.

This Court concludes that, even if petitioner's relatives, Dr. Munsinger, and Dr. Silverman all had testified at the punishment phase of petitioner's trial in the same manner as they testified before this Court

---

**163.** As petitioner's surviving trial counsel put it, petitioner not only failed to show any sincere remorse for his offense, petitioner lied when the truth would have served him better.

FEH Transcript, Volume 1, testimony of Donald Mach, at pp. 85–88, 90.

**164.** *Id.*

in November, 2010, there is no reasonable probability the outcome of the punishment phase of petitioner's capital murder trial would have been any different. In fact, had petitioner's aunt Griselda Gutierrez testified at the punishment phase of petitioner's trial in the same manner she testified before this Court, petitioner's jury would likely have deliberated for even a shorter period of time than it did (97 minutes) before returning its verdict favoring the prosecution. Reasonable jurists could not disagree with these conclusions.

Petitioner is not entitled to a CoA on any legal issue, procedural or substantive, in this cause.

Accordingly, it is hereby **ORDERED** that:

1. All relief requested in petitioner's Amended Petition, filed January 20, 2009, docket entry no. 70, as supplemented by Petitioner's Post Hearing Brief, filed Match 9, 2011, docket entry no. 149, is **DENIED.**

2. Petitioner is **DENIED** a Certificate of Appealability.

3. Any other pending motions are DISMISSED as moot.

4. The Clerk shall prepare and enter a Judgment in conformity with this Memorandum Opinion and Order.